[Cite as *State v. Sevitz*, 2015-Ohio-5047.]

IN THE COURT OF APPEALS OF OHIO
THIRD APPELLATE DISTRICT
ALLEN COUNTY

STATE OF OHIO,

      PLAINTIFF-APPELLEE,            CASE NO. 1-15-15

      v.

GERALD L. SEVITZ, JR.,            O P I N I O N

      DEFENDANT-APPELLANT.

STATE OF OHIO,

      PLAINTIFF-APPELLEE,             CASE NO. 1-15-16

      v.

GERALD L. SEVITZ, JR.,            O P I N I O N

      DEFENDANT-APPELLANT.

Appeals from Allen County Common Pleas Court
Trial Court Nos. CR 2014 0080 and 2014 0312

Judgments Affirmed

Date of Decision:   December 7, 2015

APPEARANCES:

    *Michael J. Short* for Appellant

    *Jana E. Emerick* for Appellee

**SHAW, J.**

{¶1} Defendant-appellant Gerald L. Sevitz, Jr. ("Sevitz") appeals the March 9, 2015 judgment of the Allen County Common Pleas Court in trial court case number CR 2014 0080 (corresponding to appellate case 1-15-15) sentencing Sevitz to four years of community control after Sevitz was convicted in a jury trial of Grand Theft in violation of R.C. 2913.02(A)(3) and R.C. 2913.61(C)(1), a felony of the fourth degree. Sevitz also appeals the March 9, 2015 judgment of the Allen County Common Pleas Court in trial court case number CR 2014 0312 (corresponding to appellate case 1-15-16) sentencing him to four years of community control, which was run concurrent to his community control sentence in CR 2014 0080, after Seitz pled no contest to Theft in violation of R.C. 2913.02(A)(2), a felony of the fifth degree.

{¶2} The two cases against Sevitz were consolidated on appeal; however, as they only overlap at the sentencing hearing, their facts and procedural history will be discussed separately below.

### *Facts and Procedural History for Case Number 1-15-15*
### *(Trial Court Case CR 2014 0080)*

{¶3} Sevitz was indicted in trial court case CR 2014 0080 on April 17, 2014, for Grand Theft in violation of R.C. 2913.02(A)(3) and R.C. 2913.61(C)(1),

a felony of the fourth degree due to the alleged value of the property stolen being in excess of $7,500 but less than $150,000.

**{¶4}** Sevitz pled not guilty to the Grand Theft charge and the matter proceeded to a jury trial. At trial the State called ten witnesses, which included seven witnesses who "invested" in a purported "Ponzi scheme"[1] perpetrated by Sevitz. The State established through testimony and documentation that seven people invested a total of $42,779.00 with Sevitz. As a result of those "investments," Sevitz paid out $19,899.00, leaving $22,880.00 in unaccounted for money.

**{¶5}** The State also presented the testimony of the detective who investigated the case and interviewed Sevitz. The detective testified that after looking into the flooring "jobs" Sevitz was allegedly investing the money in, he determined Sevitz's purported investments were not legitimate. The State also called two employees from Chase Bank where Sevitz did his banking. The bank employees testified that Sevitz had attempted to deposit two substantial fraudulent checks into his account, and one investor testified that Sevitz used the pending deposit slips to show him that he had money in his account to eventually pay the investors. At the conclusion of the testimony the State entered its many exhibits

---

[1] Black's Law Dictionary defines "Ponzi scheme" as, "A fraudulent investment scheme in which money contributed by later investors generates artificially high dividends or returns for the original investors, whose example attracts even larger investments. * * * Money from the new investors is used directly to repay or pay interest to earlier investors, [usually] without any operation or revenue-producing activity other than the continual raising of new funds." *Black's Law Dictionary* (10th ed. 2014).

establishing the financial figures involved in this case into evidence and rested its case.

{¶6} Sevitz then testified on his own behalf. Sevitz testified that contrary to the testimony of the State's witnesses the investments were legitimate and he had received payments for them. Sevitz testified that he had received checks for the investments but had not cashed them because he was told not to do so by the Ohio Attorney General's office. Sevitz testified that he had the checks in his possession.

{¶7} At the conclusion of Sevitz's testimony, the State moved for a continuance due to the purported checks Sevitz was claiming to have received not being disclosed in discovery. That continuance was granted so that the State could investigate Sevitz's claims.

{¶8} When the trial reconvened the State recalled the detective who investigated this case and he testified that the 23 checks produced by Sevitz were all found to be fraudulent. The case was then submitted to the jury, which returned just over an hour after beginning deliberations with a guilty verdict on the sole count against Sevitz.

{¶9} On March 9, 2015, the matter proceeded to sentencing. At sentencing the State recommended a one year prison sentence, and the defense recommended community control. The trial court ultimately sentenced Sevitz to four years of

community control.  Sevitz appealed that conviction and sentence and that appeal was assigned to appellate case number 1-15-15.

***Facts and Procedural History for Case Number 1-15-16***
***(Trial Court Case CR 2014 0312)***

{¶10} Sevitz was indicted in trial court case CR 2014 0312 on July 17, 2014 for Theft of property in the amount of $2,070.21 in violation of R.C. 2913.02(A)(2)/(B)(2), a felony of the fifth degree.  Sevitz pled not guilty to the charge.

{¶11} On November 20, 2014, Sevitz filed a motion to dismiss, contending that the six year statute of limitations had run.  Sevitz contended that the money he had accepted from the alleged victims, the O'Keefes, to purchase materials to remodel parts of their home had been given in 2007 and thus the statute of limitations had run.

{¶12} On December 1, 2014, the State filed a response to Sevitz's motion arguing that while the O'Keefe's money had been taken by Sevitz in the summer of 2007, Sevitz continued telling the O'Keefes, who were related to Sevitz by marriage, that he had bought the materials for the remodel and would begin when he could.  The State maintained it was well over a year before the O'Keefes realized that Sevitz's excuses for not being able to get to the materials, or his family members having illnesses were not legitimate, and thus the statute of limitations did not begin to run until late 2008 or 2009.

{¶13} On December 9, 2014, the trial court held a hearing on the motion to dismiss. At the hearing, the State called Marcia O'Keefe, who testified that in July of 2007 her and her husband hired Sevitz to do some remodeling work at their house for them. O'Keefe testified that Sevitz had done similar work for them in the past. O'Keefe testified that in July of 2007 she paid Sevitz $2,070.21 for materials to start the remodel. O'Keefe testified that Sevitz promptly cashed the check and stated that he had ordered the materials.

{¶14} O'Keefe testified that Sevitz then began making a number of excuses about why he could not bring the materials over and do the job. O'Keefe testified that first Sevitz stated that he had health issues, then he stated that other family members had health issues. O'Keefe testified that being family, she was aware of some of these issues so they gave Sevitz time to recover, still thinking he would eventually bring the materials over and start the job. O'Keefe testified that Sevitz continued to push back the start date.

{¶15} O'Keefe testified she was still expecting the job to be done in 2008. O'Keefe testified that Sevitz started making excuses that were not health related as to why the job was delayed such as the materials being locked in a warehouse and the doors being frozen shut at the warehouse later in the winter. O'Keefe testified that she was having conversations with Sevitz at least monthly, if not more often.

{¶16} O'Keefe testified that she still believed Sevitz would get back to the job in 2009, though she started to doubt he would be able to do it himself, so she was hoping he would just bring the materials over and the job could be finished by someone else. However, O'Keefe testified that towards the end of 2008/beginning of 2009 she started to think something was wrong because Sevitz's excuses were starting to get repetitive. O'Keefe testified Sevitz would give a similar excuse as to why the date had to be pushed further back to one he had given before just with a slight twist.

{¶17} O'Keefe testified that Sevitz continued to state that he would deliver the materials and finish the job all the way from 2011 through 2014, but by 2011 she did not believe Sevitz was going to do the job or bring the materials. At the conclusion of O'Keefe's testimony, the State rested. The parties then made closing arguments and the trial court took the matter under advisement.

{¶18} On December 10, 2014, the trial court filed a judgment entry denying Sevitz's motion to dismiss. In the entry the trial court determined that the statute of limitations had been tolled in this case by Sevitz engaging in "a continuous course of deception by continuously telling the victim that he had purchased the materials necessary to complete her bathroom remodel and continuously telling the victim that he would finish the remodel job, only to come up with excuse after excuse (some of which the victim said might have been legitimate) why he could

not complete the job." (Doc. No. 38). The trial court determined that the victim did not realize that Sevitz had stolen from her until a year to a year and a half after she gave Sevitz the money to buy the materials. The trial court determined thus that the indictment, returned in July of 2014, was within the six year statute of limitations.

{¶19} On February 25, 2015, Sevitz entered into a negotiated plea agreement wherein he agreed to plead no contest to Theft in violation of R.C. 2913.02(A)(2). A change of plea hearing was held wherein the trial court conducted a Crim.R. 11 colloquy with Sevitz. After the colloquy the trial court determined that Sevitz was knowingly, intelligently, and voluntarily entering his plea. Sevitz then signed a written plea agreement in open court.

{¶20} Next, the trial court asked the State for a factual basis for the charges, and facts were read into the record. Based on the facts read into the record, and the allegations contained in the indictment, the trial court found Sevitz guilty of Theft.

{¶21} On March 9, 2015, the case proceeded to sentencing. Sevitz was sentenced to four years of community control, which was run concurrent to his sentence in CR 2014 0080. A judgment entry reflecting this sentence was filed March 9, 2015. Sevitz now appeals this judgment, which was assigned to appellate case number 1-15-16.

**ASSIGNMENT OF ERROR 1**
**IN CASE CR 2014 0312 THE TRIAL COURT ERRED IN FINDING THE STATUTE OF LIMITATIONS HAD NOT EXPIRED.**

**ASSIGNMENT OF ERROR 2**
**THE CONVICTION IN CASE CR 2014 0312 WAS BASED ON INSUFFICIENT EVIDENCE.**

**ASSIGNMENT OF ERROR 3**
**THE CONVICTION IN CASE CR 2014 0080 WAS BASED ON INSUFFICIENT EVIDENCE.**

**ASSIGNMENT OF ERROR 4**
**THE CONVICTION IN CASE CR 2014 0080 WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.**

{¶22} We elect to address the assignments of error out of the order in which they were raised.

*Third Assignment of Error*

{¶23} In Sevitz's third assignment of error, he argues that the State produced insufficient evidence to convict him of Grand Theft in trial court case CR20140080. We disagree.

{¶24} Whether there is legally sufficient evidence to sustain a verdict is a question of law. *State v. Thompkins*, 78 Ohio St.3d 380, 386 (1997). Sufficiency is a test of adequacy. *Id.* When an appellate court reviews a record upon a sufficiency challenge, " 'the relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable

doubt.' " *State v. Leonard,* 104 Ohio St.3d 54, 2004–Ohio–6235, ¶ 77, quoting *State v. Jenks,* 61 Ohio St.3d 259 (1991), paragraph two of the syllabus.

{¶25} In trial court case CR 2014 0080 Seitz was convicted of Grand Theft in violation of R.C. 2913.02(A)(3) and R.C. 2913.61(C)(1). Revised Code 2913.02(A)(3) reads,

> **(A) No person, with purpose to deprive the owner of property or services, shall knowingly obtain or exert control over either the property or services in any of the following ways:**
>
> **\* \* \***
>
> **(3) By deception[.]**

Revised Code 2913.61(C)(1) reads,

> **When a series of offenses under section 2913.02 of the Revised Code \* \* \* is committed by the offender in the offender's same employment, capacity, or relationship to another, all of those offenses shall be tried as a single offense. When a series of offenses under section 2913.02 of the Revised Code, or a series of violations of, attempts to commit a violation of, conspiracies to violate, or complicity in violations of section 2913.02 or 2913.43 of the Revised Code involving a victim who is an active duty service member or spouse of an active duty service member is committed by the offender in the offender's same employment, capacity, or relationship to another, all of those offenses shall be tried as a single offense. The value of the property or services involved in the series of offenses for the purpose of determining the value as required by division (A) of this section is the aggregate value of all property and services involved in all offenses in the series.**

{¶26} In order to convict Sevitz, at trial the State called ten witnesses, which included seven witnesses who were involved in a purported Ponzi scheme perpetrated by Sevitz. According to the testimony at trial, Sevitz took money from seven "investors" who were told that their money would be used to purchase materials for flooring jobs that Sevitz claimed to be providing at various commercial locations throughout the United States. At one time Sevitz had owned a flooring business in Lima and he still did odd jobs for people despite being on social security for partial disability. Sevitz claimed to also be a middleman providing discount flooring materials to commercial flooring jobs.

{¶27} The investors were led to believe that their money would be used to pay for the flooring materials for Sevitz and that Sevitz—or crews he would contact—would install the flooring at commercial job sites at a markup of between 40-80% on the flooring materials. Sevitz would then pass the markup on the flooring materials back to the investors as profit. Sevitz, or his crews performing the work, would get the money for labor, and take no profit from the material itself—that profit would only go to the "investors." Sevitz stated that every "job" was bonded and that if the customers failed to pay, the insurance bond would cover the initial investment, so there was no risk involved.

{¶28} Sevitz kept a list of "jobs" that the investors could elect to invest in, which required varying levels of funding and presented differing rates of return.

None of the return rates promised was less than 40%, most were in the 50-60% range, and at least one was as high as 80%. Sevitz would provide the investors with a kind of "receipt" on "Job Invoice" pages indicating what job the investment was for, how much money was invested, the expected financial return, and often the expected return date (typically around 60 days). Many of these receipts were introduced into evidence.

{¶29} James Hurt was the first of the group of seven investors to invest with Sevitz and he made the first of his multiple investments on August 10, 2012. After he received a profitable return on his early investment later that month, he told other people about Sevitz's investment deal and they got involved investing money with Sevitz as well. From August of 2012 to April of 2013 the State established through testimony and documentation that seven people invested a total of $42,779.00 with Sevitz. One victim, Russell Kitchen, personally invested $15,793.00 with Sevitz, while others invested as little as $1,000.00.

{¶30} As a result of the "investments," Sevitz paid out $19,899.00, leaving $22,880.00 in unaccounted for money. When Sevitz was not returning the investment money itself, let alone the profits, the investors started inquiring about their money.

{¶31} The investors testified that they attempted to get their money back from Sevitz and stated that Sevitz always had a new excuse as to why he could not

pay. The investors testified that Sevitz constantly had a new excuse for not having their money. Sevitz would tell them that their checks were in the mail or had been lost or that the general contractor he "worked" for was going through probate due to the owner dying and the money was tied up. The investors testified that Sevitz's excuses went on for months and months and they began to think that something was not right.

{¶32} The investors testified that they looked into the company Sevitz stated he was affiliated with and could not find that it existed. Some also testified that they contacted job sites where Sevitz claimed he had worked and had given them receipts/invoices for and that no one knew who he was. Eventually the investors went to the police, and Detective Mark Baker investigated.

{¶33} Detective Baker testified that he looked into the purported "jobs" of Sevitz and he could not find a single job that Sevitz claimed to have done where anyone knew who Sevitz was. Baker also looked into the company Sevitz claimed to be affiliated with and could not find that it existed either. In addition, Baker interviewed Sevitz and that interview was played for the jury. During the interview Sevitz maintained a story that the construction company he was affiliated with was real and that it would be paying on all of the old jobs eventually.

{¶34} The State also presented the testimony of two Chase Bank employees. Sevitz did his banking with Chase and had presented fraudulent checks there in August of 2013 to be deposited in large amounts. One check was in excess of $89,000, and the other was in excess of $275,000. Sevitz got a receipt for the pending deposits, which would be credited to his account several days later if the checks cleared. Sevitz used the receipts for the pending deposits to show one of his investors that he was going to have the money to pay the investors soon. The bank employees testified that Sevitz's checks were ultimately fraudulent and the money was not put into his account.

{¶35} After the State presented the testimony of the seven investors, the detective who investigated the case, and the two bank employees, the State entered its many exhibits establishing the financial figures in this case into evidence, and then the State rested. Sevitz made a Crim.R. 29 motion for acquittal, and that motion was overruled by the trial court.

{¶36} On appeal, Sevitz argues that the State did not present sufficient evidence to convict him. To support his argument, Sevitz first claims that he did not guarantee a return on his investment, and that there was no contract indicating when the returns were supposed to be paid to the investors.

{¶37} Contrary to Sevitz's arguments, the State did present testimony that Sevitz guaranteed the investment money. There was testimony that Sevitz

indicated all of his "jobs" were insured so the investors could not lose their initial "investment." In addition, Sevitz also specifically stated in his interview that he guaranteed the initial investments. While Sevitz did not guarantee the *profits*, the State was not calculating lost potential profits and prosecuting based on that sum, but rather prosecuting Sevitz for the *investment* money Sevitz repeatedly could not produce to the investors.

{¶38} Moreover, many of the "receipts" or "invoices" Sevitz gave to the "investors" stated specific timelines for the return on their investment. For example, State's Exhibits 2-6, and 8 all indicate in the "terms" section that the investment would pay out in 60 days. This was consistent with the testimony of the "investors" at trial. Thus Sevitz's arguments that there were no guarantees on the investments and no timeline to pay are not well-taken.

{¶39} In arguing that there was insufficient evidence to convict him, Sevitz next contends that it was actually Jim Hurt, one of the investors, who told the others about Sevitz's investments and got them involved. Sevitz argues that the investment transactions for Missy Karcz, Chris Karcz, and Abraham Chontos actually went through Jim Hurt.

{¶40} Jim Hurt did testify that he told other people about the opportunity with Sevitz since he was making money from it. However, many of the investors who testified indicated that even though Jim Hurt had told them about investing

with Sevitz, they still invested directly with Sevitz. Their money did not go through Jim Hurt. For the few witnesses that did give their money to Jim Hurt to give to Sevitz, the State established through documentation that the money was ultimately given to Sevitz.

{¶41} The investor who lost the most money with Sevitz was Russell Kitchen. Kitchen specifically testified that all but his first investment with Sevitz did not involve Jim Hurt at all and that Kitchen dealt directly with Sevitz for those investments. Kitchen's first investment, which he did along with Jim Hurt, was for $1,000. Kitchen went on to invest a total of $15,793.00 with Sevitz and only received a payout for $600. For all but the initial $1,000 investment, Kitchen testified that he spoke to, and dealt directly with, Sevitz. The money taken from Kitchen alone that was not returned where Kitchen directly "invested" with Sevitz without any involvement from Jim Hurt, $14,193, would be enough to satisfy the State's burden to convict Sevitz under R.C. 2913.02(A)(3).

{¶42} However, the jury did not have to rely on Kitchen's testimony alone as it was similar to that of other witnesses. Sheila Hairston also testified that she invested money directly with Sevitz. The exhibits indicated that she invested $7,513 and received a payout of $5,106, leaving her with a net loss of $2,407. Brooke Hurt, Jim's daughter, testified that she invested $3,150 directly with Sevitz. The State introduced into evidence a copy of the cashier's check Brooke

gave to Sevitz which was made out to Sevitz. Brooke never received any return on her money.

**{¶43}** Multiple witnesses thus testified that they invested money *directly with Sevitz* and the exhibits corroborated that testimony. To counter this evidence Sevitz attempts to point to three witnesses who gave money to Jim Hurt who was then supposed to give the investment money to Sevitz. However, the State established that the money given to Hurt to invest with Sevitz was ultimately given to Sevitz. Nevertheless, we would note that two of the three witnesses Sevitz references actually made a small profit. Abe Chontos invested $1,000 and received back $1,200, so he made $200. Similarly, Melissa Karcz invested $1,000 and she received $1,700, so she made $700.

**{¶44}** The third witness that Sevitz contends actually gave his money to Jim Hurt, Chris Karcz, testified that he gave his money to Jim Hurt to give to Sevitz. However, Jim Hurt produced a copy of a check that went to Sevitz for the money Chris invested. There is absolutely no indication in the record that Jim Hurt kept Chris Karcz's money. Thus while Sevitz attempts to point to three specific investors to say that their money first went through Jim Hurt before going to Sevitz, the State established that the money still ultimately went to Sevitz. Therefore Sevitz's argument is not well-taken.

**{¶45}** Based on the evidence presented at trial we cannot find that there was insufficient evidence presented to convict Sevitz. Accordingly, Sevitz's third assignment of error is overruled.

*Fourth Assignment of Error*

**{¶46}** In his fourth assignment of error, Sevitz contends that his conviction in trial court case CR20140080 was against the manifest weight of the evidence. We disagree.

**{¶47}** The Ohio Supreme Court has "carefully distinguished the terms 'sufficiency' and 'weight' in criminal cases, declaring that 'manifest weight' and 'legal sufficiency' are 'both quantitatively and qualitatively different.' " *Eastley v. Volkman,* 132 Ohio St.3d 328, 2012–Ohio–2179, ¶ 10, quoting *State v. Thompkins,* 78 Ohio St.3d 380 (1997), paragraph two of the syllabus.

**{¶48}** Unlike our review of the sufficiency of the evidence, an appellate court's function when reviewing the weight of the evidence is to determine whether the greater amount of credible evidence supports the verdict. *Thompkins*, *supra*, at 387. In reviewing whether the trial court's judgment was against the weight of the evidence, the appellate court sits as a "thirteenth juror" and examines the conflicting testimony. *Id.* In doing so, this Court must review the entire record, weigh the evidence and all of the reasonable inferences, consider the credibility of witnesses, and determine whether in resolving conflicts in the

evidence, the factfinder "clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *Thompkins* at 387.

{¶49} In this case, after the State presented its case-in-chief, Sevitz testified on his own behalf. Sevitz testified that contrary to the testimony of the State's witnesses the investments were legitimate and they actually had been paid at the time of trial. Sevitz testified that he had received the checks for the jobs but had not cashed them because he was told not to do so by the Ohio Attorney General's office. Sevitz testified that he had the checks in his possession.

{¶50} Sevitz also testified that he had guaranteed the investors' original investment money. He testified that he knew he owed Russell Kitchen and Sheila Hairston money, and that he was not sure if he paid Brooke Hurt. Sevitz testified that he knew his paperwork was not "the greatest." (Tr. at 294). At the conclusion of Sevitz's testimony, he rested his case.

{¶51} On rebuttal, the State recalled Detective Mark Baker, who testified that he investigated the 23 checks produced by Sevitz that Sevitz claimed he had received since the inception of this case and that all the checks were found to be fraudulent. Detective Baker testified that the checks were almost all from different financial institutions and were from all over the United States. Detective Baker testified that he spoke with the banks that had purportedly issued the

checks. None of the checks Sevitz produced were found to be valid. Detective Baker testified that one of the banks he spoke to actually was familiar with the remitter who was listed on a couple of the fraudulent checks because that specific remitter was being used on a number of fraudulent checks that bank had dealt with.

**{¶52}** On appeal, Sevitz now claims that his conviction was against the weight of the evidence, arguing that "[t]he same arguments presented in Assignment of Error III concerning the sufficiency of the evidence apply to this assignment of Error." (Appt.'s Br. at 9). Sevitz contends that the evidence presented was not credible, and there was no evidence that Sevitz deceived anyone.

**{¶53}** Contrary to Sevitz's arguments, the State presented the testimony of the investors and supported it with substantial documentation. That documentation included copies of checks that had been provided to Sevitz, "receipts" given from Sevitz to the investors, and copies of Sevitz's bank records.

**{¶54}** Moreover, not only was an interview with Sevitz played for the jury, but Sevitz also testified in this case. Sevitz testified that he had received all of the money he was supposed to pay out to the investors. The State inquired into Sevitz's claims and found that all of the checks Sevitz claimed to have received were fraudulent. Sevitz thus severely lacked credibility when factoring in that two

Chase bank employees testified that Sevitz had attempted to deposit two very large fraudulent checks with them as well. The jury was free to evaluate Sevitz's credibility and find Sevitz's claims that the investments were "legitimate" to be disingenuous.

**{¶55}** Based on all the evidence presented we cannot find that the factfinder clearly lost its way or created a manifest miscarriage of justice. Accordingly Sevitz's fourth assignment of error is overruled.

*First Assignment of Error*

**{¶56}** In Sevitz's first assignment of error, he argues that the trial court erred in case CR 2014 0312 when it determined that the statute of limitations had not expired at the time the State brought its indictment. Specifically, Sevitz contends that the O'Keefes gave him a check for $2,070.21 in 2007 and that he was not prosecuted until 2014, beyond the six year statute of limitations. We disagree.

**{¶57}** In trial court case CR 2014 0312, Seitz was indicted July 17, 2014, for Theft in violation of R.C. 2913.02(A)(2)/(B)(2). According to R.C. 2901.13(A)(1)(a), the statute of limitations for felony Theft is six years. However, the statute of limitations can be tolled pursuant to R.C. 2901.13(E), which reads, "An offense is committed when every element of the offense occurs. In the case of an offense of which an element is a continuing course of conduct, the period of

limitation does not begin to run until such course of conduct or the accused's accountability for it terminates, whichever occurs first."

**{¶58}** Sevitz filed a motion to dismiss in this case after the indictment was returned, contending that the O'Keefes paid him for remodeling work in July of 2007 and that the statute of limitations should have run from the date the O'Keefes paid him. The trial court held a hearing on the motion, and Marcia O'Keefe testified that after Sevitz took her $2,070.21 check, he promptly cashed it and then told her and her husband that he had bought materials for the remodel.

**{¶59}** O'Keefe testified that Sevitz then had some health problems, which were followed by health problems of other family members, delaying Sevitz's proposed start of the remodel. O'Keefe testified that Sevitz delayed the start into 2008, and that eventually Sevitz started making excuses about the materials he purchased being locked in a warehouse that he could not access for one reason or another. O'Keefe testified that Sevitz always had a new excuse and she continued to believe he would complete the remodel into late 2008 and early 2009.

**{¶60}** O'Keefe testified that in early 2009 she started to think Sevitz was not going to complete the job so she just tried to get him to bring over the materials so that she could get someone else to do it. O'Keefe testified that Sevitz continued to make excuses about why he could not do it and kept delaying. O'Keefe testified that eventually she realized that Sevitz was not going to do the

job or deliver the materials, but Sevitz continued to make assurances that he would do the remodel from 2011 all the way to 2014.

{¶61} In analyzing these facts to render its decision on the motion to dismiss, the trial court determined that,

> **the record supports a finding that defendant engaged in a continuous course of deception by continuously telling the victim that he had purchased the materials necessary to complete her bathroom remodel and continuously telling the victim that he would finish the remodel job, only to come up with excuse after excuse (some of which the victim said might have been legitimate) why he could not complete the job.**
>
> **\* \* \***
>
> **Accordingly, based on the evidence presented, the statute of limitations did not commence until the victim finally realized that defendant was not going to purchase the materials he promised to purchase and was not going to finish the remodel. At that time, the victim realized she had been deceived (or was continually being deceived) and it was then that the theft ended. According to the testimony, the victim realized that defendant had stolen from her about a year or a year and a half after she gave defendant the money to buy the shower material, or sometime after July 2008 until 2009. Defendant even continued to deceive the victims into believing he was going to complete the work in 2014. Since the indictment in this case was returned in July 2014, it was within six years from the completion of the alleged theft. Defendant engaged in a continuous course of deception. \* \* \* This was not a case in which the defendant accepted the victim's money and was never heard from again. \* \* \* Defendant continued to lead the victim to believe he would complete the work.**

(Doc. No. 38). The trial court thus overruled Sevitz's motion to dismiss.

{¶62} Sevitz argues on appeal that the trial court erred in its decision because if the O'Keefes were reasonable they would have realized long before they did that Sevitz did not intend to do the work. However, the O'Keefes continued to believe that Sevitz would not steal from them because they were family and because of Sevitz's continued assurances. Sevitz continued to make excuses to the O'Keefes for years after he accepted their 2007 check as to why the start date had to be pushed back and he continued to assure the O'Keefes that he would eventually deliver the materials. Under the facts and circumstances of this case we cannot find that the trial court erred in determining that the statute of limitations had not run at the time the State brought the indictment. Therefore, Sevitz's first assignment of error is overruled.

*Second Assignment of Error*

{¶63} In Sevitz's second assignment of error, he argues that there was insufficient evidence to convict him in trial court case CR 2014 0312 based on his no contest plea. Specifically Sevitz argues that the State never presented evidence that Sevitz exceeded the scope of his consent. We disagree.

{¶64} "Unlike with respect to a misdemeanor offense to which a plea of no contest is entered, the court is not required to have before it a statement of the particular conduct constituting the alleged offense when it accepts a defendant's plea of no contest to a felony charge." *State v. Cooper*, 2d Dist. Montgomery No.

21344, 2006-Ohio-4004, ¶ 6. The Rules of Criminal Procedure provide that a "plea of no contest is not an admission of defendant's guilt, but is an admission of the truth of the facts *alleged in the indictment*[.]" (Emphasis added.) Crim.R. 11(B). The Ohio Supreme Court has determined that "[w]here the indictment, information, or complaint contains sufficient allegations to state a felony offense and the defendant pleads no contest, the court must find the defendant guilty of the charged offense. *State v. Bird*, 81 Ohio St.3d 582 (1998), syllabus, citing *State ex rel. Stern v. Mascio*, 75 Ohio St.3d 422, 425 (1996).

{¶65} In this case Seitz was indicted for one count of Theft in violation of R.C. 2913.02(A)(2)/(B)(2), a felony of the fifth degree. The indictment read that on or about July 1, 2007, through April 11, 2014, Sevitz "did with purpose to deprive the owner, John O[']Keefe, of [m]oney or services, knowingly obtain or exert control over either the property or services beyond the scope of the express or implied consent of the owner or person authorized to give consent. FURTHERMORE, the property or services stolen is valued at [$2,070.21]." (Emphasis *sic*); (Doc. No. 1).

{¶66} The indictment thus clearly stated that the element of "beyond the scope of the express or implied consent" was present in this case and Sevitz pled no contest to the indictment. According to the criminal rules and the Ohio

Supreme Court's decisions interpreting them, Sevitz's argument that this element

was not established is thus not well-taken.

**{¶67}** Nevertheless, although it was not required to do so, we would note

that the State *did* provide a factual narrative of Sevitz's crime at the plea hearing.

Specifically the State narrated,

> **In Late July/early August of 2007 John and Marcia O'Keefe hired the defendant to remodel their bathroom at their home at 1741 Deerfield Drive in Lima, Ohio, Allen County. During that time they wrote him a check for the amount of two thousand and seventy dollars and twenty-one cents to cover the cost of a new shower and for the remodeling, which was separate, for Mr. Sevitz to do. That shower was never installed. The remodeling was never completed by Mr. Sevitz. However, the cash, or, the check was cashed by the defendant only days later, which I believe would have been by August 14th of 2007. So, since that time * * * the defendant did not complete any work whatsoever regarding the shower, nor buying that shower unit which was never delivered to the victims in this case.**
>
> **Additionally, the victims did not know of the theft, so to say, of that two thousand and seventy dollars and twenty-one cents until a year to a year and a half later when it became clear that the defendant was not going to remodel the bathroom.**

(Feb. 25, 2015, Tr. at 12).

**{¶68}** After the State's narration the trial court found Sevitz guilty based on

the recitation of facts and a "*review [of] the allegations in the indictment*."

(Emphasis added). Contrary to Sevitz's argument, we do not find the State's

factual narrative deficient even if it had been required. However, even if we did,

the trial court specifically and explicitly stated it also considered the allegations in

the indictment, which were sufficient to convict Sevitz. Therefore Sevitz's second assignment of error is overruled.

**{¶69}** Having found no error prejudicial to Sevitz in either appellate case 1-15-15, or 1-15-16, Sevitz's assignments are overruled and the judgments of the Allen County Common Pleas Court are affirmed.

*Judgments Affirmed*

**ROGERS, P.J. and WILLAMOWSKI, J., concur.**

**/jlr**