[Cite as *State v. Olson*, 2013-Ohio-4403.]

IN THE COURT OF APPEALS FOR MONTGOMERY COUNTY, OHIO

| | | |
|---|---|---|
| STATE OF OHIO | : | |
| Plaintiff-Appellee | : | C.A. CASE NO. 25452 |
| v. | : | T.C. NO. 10CR3369 |
| JAMES OLSON | : | (Criminal appeal from Common Pleas Court) |
| Defendant-Appellant | : | |
| | : | |

. . . . . . . . . .

**O P I N I O N**

Rendered on the ____4th____ day of _____October_____, 2013.

. . . . . . . . . .

CARLEY J. INGRAM, Atty. Reg. No. 0020084, Assistant Prosecuting Attorney, 301 W. Third Street, 5th Floor, Dayton, Ohio 45422
      Attorney for Plaintiff-Appellee

ANTONY A. ABBOUD, Atty. Reg. No. 0078151, 130 W. Second Street, Suite 2000, Dayton, Ohio 45402
      Attorney for Defendant-Appellant

. . . . . . . . . .

FROELICH, J.

**{¶ 1}** James Olson appeals from orders of restitution imposed by the Montgomery County Court of Common Pleas.

**{¶ 2}** In 2011, Olson pled guilty to one count of aggravated theft (from the Fred J. Miller Corporation) and pled no contest to one count each of grand theft (from the

Miamisburg Color Guard) and theft (from the Mid-East Performance Association); he was found guilty of all three offenses. The plea agreement provided for the payment of restitution, but not the specific amounts. The trial court conducted a hearing on restitution before imposing its sentence.

{¶ 3} On July 7, 2011, the trial court sentenced Olson to an aggregate term of two years in prison and ordered that he pay restitution to each of the three victims as follows: $115,672.11 to the Fred J. Miller Corporation, $49,139.78 to the Miamisburg Color Guard, and $2,384.34 to the Mid-East Performance Association.[1] On appeal, Olson challenges only the court's orders of restitution.

{¶ 4} For the following reasons, the judgment of the trial court with respect to restitution owed to the Fred J. Miller Company will be affirmed in part and reversed in part; with respect to Miamisburg Color Guard, the order of restitution will be vacated, and the matter will be remanded for further proceedings; and with respect to the Mid-East Performance Association, the order of restitution will be affirmed.

{¶ 5} Olson raised three assignments of error on appeal.

{¶ 6} Olson's first assignment of error states:

---

[1] Subsequent to the court's July 7, 2011 termination entry, in which these amounts of restitution were imposed, the trial court filed two additional entries in which it modified the amounts of restitution. The entries of July 14 and 27 slightly lowered the restitution amounts due to Fred J. Miller Corp. and Miamisburg Color Guard, without explanation.

Olson initially filed a notice of appeal from the last of these entries, which was filed on July 27, 2011. The State moved to dismiss that appeal, arguing that the July 7 order was the final appealable order, and the trial court had no authority to reconsider or modify the amount of restitution after the July 7 order was filed. We agreed with the State and dismissed Olson's initial appeal. *State v. Olson*, 2d Dist. Montogmery No. 24780, Decision & Entry (July 30, 2012). Thereafter, we granted Olson's motion for delayed appeal from the July 7, 2011 entry. *State v. Olson*, 2d Dist. Montgomery No. 25452, Decision & Entry (Nov. 29. 2012).

THE TRIAL COURT ABUSED ITS DISCRETION ON ITS JULY 7TH TERMINATION ENTRY, WHEN ORDERING THE DEFENDANT-APPELLANT TO PAY RESTITUTION IN THE AMOUNT OF $115,672.11 TO THE FRED J. MILLER CORPORATION.

{¶ 7} The trial court ordered Olson to pay $115,672.11 in restitution to the Fred J. Miller Corporation ("FJM"). Of this amount, $58,411.41 was related to his theft, and $57,261 was for the reimbursement of accounting and legal expenses incurred by the company as a result of his theft. The company received an additional $100,000 in compensation for the theft from its insurance company; the amount of restitution ordered reflects the company's loss attributable to the theft exceeding $100,000.[2]

{¶ 8} When seeking restitution, the victim has the burden to prove by a preponderance of the evidence the amount of restitution sought from the offender. *State v. Johnson*, 164 Ohio App.3d 792, 2005-Ohio-6826, 844 N.E.2d 372 (2d Dist.), ¶ 72. R.C. 2929.28(A)(1) grants broad discretion to the trial court to "base the amount of restitution it orders" on new information presented at the restitution hearing, which can be from the victim, the offender, a presentence investigation report, estimates, receipts, or "any other information." We review a trial court's order of restitution under an abuse of discretion standard. *State v. Johnson*, 2d Dist. Montgomery No. 24288, 2012-Ohio-1230, ¶ 11; *State v. Naylor*, 2d Dist. Montgomery No. 24098, 2011-Ohio-960, ¶ 22.

{¶ 9} Olson served as chief operating officer for FJM for several years. The

---

[2]In 2004, R.C. 2929.18(A)(1), regarding the imposition of financial sanctions, was amended to delete a provision allowing reimbursement "to third parties for amounts paid to or on behalf of the victim * * * for economic loss resulting from the offense." *See State v. Martin*, 1st Dist. Hamilton No. C-110204, 2012-Ohio-2441, ¶ 6-7. Thus, Olson was not ordered to reimburse FJM's insurance company for that payment.

company manufactured uniforms for marching bands and their auxiliary units. Olson was accused of using a signature stamp of the company's owner, Fred J. Miller, to issue unauthorized checks to the Mid-East Performance Association ("MEPA"), a non-profit organization of which he was the treasurer. Olson then issued checks from MEPA to himself. He was also accused of issuing some unauthorized checks from FJM to himself or to "cash."

{¶ 10}   Olson admitted that he had misappropriated $52,161.41 from FJM (over and above the $100,000 covered by the company's insurance). The State claimed, however, that beyond the $52,161.41 Olson admitted to taking, he had taken an additional $6,250, which correlated to five specific checks that he had written to himself, to "cash", or to the Miamisburg Winter Guard (a division of the Miamisburg Color Guard). Olson testified that these checks had been for sponsorships, expenses, or other legitimate purposes. The State presented evidence from the president of FJM that the five checks in question had been unauthorized, did not "mak[e] sense" in the context of other expenditures, or were listed as being for activities (such as sponsorships) in which the company did not engage. The trial court implicitly concluded that the disputed checks had not been authorized or for legitimate purposes, and it included these amounts in its order of restitution ($52,161.41 + $6,250 = $58,411.41).

{¶ 11}   The credibility of the evidence was for the trial court to determine, because it heard the evidence directly. *State v. Myles*, 2d Dist. Montgomery No. 25297, 2013-Ohio-2227, ¶ 21. Conflicting evidence was presented. We cannot conclude that the trial court abused its discretion in weighing the evidence as it did or crediting FJM's

president's testimony regarding the disputed checks.

{¶ 12}   Olson also argues that the trial court erred in including items such as accounting and attorney fees, which were incurred by FJM as a result of his theft, in the amount of restitution he was ordered to pay.

{¶ 13}   The amount a trial court is authorized to order as restitution can be determined by reading R.C. 2929.18(A)(1) (authorizing a trial court to impose restitution) in conjunction with R.C. 2929.01(L)'s definition of "economic loss." *State v. Lalain*, Ohio St.3d ____, 2013-Ohio-3093, ____ N.E.2d ____, ¶ 20-22.  R.C. 2929.01(L) defines economic loss as "any economic detriment suffered by a victim as a direct and proximate result of the commission of an offense.  * * * 'Economic loss' does not include non-economic loss or any punitive or exemplary damages."  Based on this definition, the supreme court recently concluded that an award of restitution is limited as follows:

> R.C. 2929.18(A)(1) * * * limits the amount of restitution to the amount of the economic detriment suffered by the victim as a direct and proximate result of the commission of the offense.  And although the statute [R.C. 2929.18(A)(1)] allows the court to base the amount of restitution on an amount recommended by the victim or the offender, a presentence investigation report, estimates or receipts indicating the cost of repairing or replacing property, and other information, it does not provide restitution for the costs of preparing such a report.  * * *

*Lalain* at ¶ 22.

{¶ 14}   In *Lalain*, the court rejected the victim-company's claim for restitution

based on "time spent by its employees in support of this case" and "to provide the County Prosecutor's Office with an accurate valuation of the property that was recovered." *Id.* at ¶ 25. (The valuation issues in *Lalain* were particularly difficult, because the case involved the theft of intellectual property.) The court held that these expenditures were not the "direct and proximate result" of the theft offense, but were "consequential costs incurred subsequent to the theft to value the property that had been taken and later returned." *Id.*

{¶ 15} The executive vice-president of FJM testified that, after Olson's thefts were discovered, the company hired an accounting firm to review and correct the company's financial statements for the two previous years, hired a different accounting firm to determine the amount of the theft, and hired a law firm to pursue a civil law suit against Olson. The costs of these services were included on State's Exhibit 13 and totaled $57,261. The trial court included these amounts in its order of restitution, specifying $37,185 for accounting fees and $20,076 for legal fees. Because the supreme court held in *Lalain* that costs associated with documenting a loss and/or pursuing legal action against an offender may not be included in an order of restitution, we must conclude that the trial court erred in including the amounts associated with FJM's accounting and legal fees in its order of restitution.

{¶ 16} When it ordered restitution to FJM in the amount of $115,672.11, the trial court improperly included $57,261 that was attributable to accounting and legal fees. Thus, the trial court's award will be affirmed in part and reversed in part, such that the amount of restitution to FJM is $58,411.41, the same amount discussed in ¶ 7, supra ($115,672.11 - $57,261 = $58,411.41).

{¶ 17}  The first assignment of error is sustained in part and overruled in part.

{¶ 18}  The second assignment of error states:

THE TRIAL COURT ABUSED ITS DISCRETION ON ITS JULY 7TH TERMINATION ENTRY, WHEN ORDERING THE DEFENDANT-APPELLANT TO PAY RESTITUTION IN THE AMOUNT OF $49,178.78 TO THE MIAMISBURG COLOR GUARD/WINTER GUARD.

{¶ 19}  Olson contends that the order of restitution to the Miamisburg Color Guard ("MCG") in the amount of $49,178.78 was unsupported by the evidence.

{¶ 20}  Olson was the director of the MCG.  MCG had one operating account, on which Olson was not an authorized signatory; to obtain reimbursement from that account, the president or treasurer would have to be involved.  Olson opened a second MCG account, on which he was the only signatory.  The funds deposited in that account came primarily from an international organization, Winter Guard International, and represented MCG's share of ticket sales from competitions; one additional check from Gateway High School was also deposited into the account.  Conflicting evidence was presented as to whether the officers of the MCG knew of the existence of the second account.

{¶ 21}  Detective Matthew Scott Moore of the Miami Township Police Department investigated Olson's thefts.  Moore presented a list of checks from Winter Guard International that had been deposited into MCG's "shadow account" between 2002 and 2009.  These checks totaled $46,305.95.

{¶ 22}  Detective Moore testified that he had MCG "representatives, being Laura

Coleman, go back through the past records," and the Winter Guard International checks that were deposited into the account were "unknown to them." (Moore identified Laura Coleman as the treasurer of MCG, but she did not testify.) Detective Moore presented a list and copies of checks that were deposited into the MCG "shadow account" from Winter Guard International and a copy of the Gateway check; he did not provide comparable documentation of how the funds deposited into the "shadow account" were spent. He testified, however, that Olson used the shadow account "for personal needs, paying off his credit cards, * * * made payments to his American Express card. He also made payments to BMW Financial for a vehicle." Detective Moore acknowledged that Olson incurred "significant legitimate expenses related to the color guard" for which he was entitled to payment from MCG. He also acknowledged that some members of the MCG board disagreed with his assertion that Olson stole any money from MCG.

{¶ 23} Olson testified that no MCG funds had been misappropriated and that the funds in the second account were used for MCG expenses "that were outside the budget." He also asserted that he had been entitled to "the majority" of the money that was missing from the MCG account as reimbursement for expenses.

{¶ 24} No specific evidence was offered by either party as to whom the funds in this account were distributed.

{¶ 25} Olson also deposited a $2,600 check from Gateway High School into the second MCG account, bringing the total deposited into the account to $48,905.95. According to Detective Moore, the Gateway check was to cover Gateway's purchase of "guard tarps and flags" from MCG. Olsen testified that, of the $2,600, $1,800 was owed to

MCG for the materials he sold, and $800 was a fee owed to him for "services rendered." Olson deposited the check from Gateway into the second account, then wrote a $1,800 check from FJM to MCG in payment for the equipment.

{¶ 26} Detective Moore testified that, by his calculation, Olson's handling of the Gateway check and his reimbursement of MCG using an $1,800 check from FJM constituted a theft of $4,400 ($2,600 from MCG and $1,800 from FJM).

{¶ 27} Several current and former officers of the MCG testified that they were unsure whether Olson owed any money to the organization; others testified that he did not owe the organization any money and that, in fact, MCG owed him money. The treasurer and past-president of MCG testified that the organization's "books are balanced" for the period in question and that she "did not find any mishandling of any funds." Some of the past officers testified that they had known of the existence of the second account opened by Olson for MCG, but others testified that they had not known of the second account. These witnesses testified that, to their knowledge, Olson had used the proper expense reimbursement procedure of submitting receipts and getting payments through the MCG operating account. Some of the MCG officers testified that Olson did not always seek reimbursement for his expenses and advanced monies to MCG by paying for things on his credit card if the group did not have the funds to cover an expense at the time it was incurred. Several MCG representatives also testified that the organization still owed Olson money for expenses that had not been reimbursed.

{¶ 28} The trial court ordered Olson to pay restitution to the MCG in the amount of $48,905.05. This number is based on the total deposits originated with Winter Guard

International and Gateway High School into the MCG account opened by Olson.

{¶ 29}   Olson contends that the trial court erred in awarding an "egregious amount of restitution" to MCG, when the victims of the alleged theft claimed that the organization was not owed any money.   The State argues that the trial court could have found the witnesses from MCG unreliable, because some of them were friends of Olson or could not fully explain why he had handled money the way he did.   The State further asserts that, because the State's witnesses and the defense witnesses came to different conclusions about what was owed, the trial court could have reasonably resolved the conflicts in the evidence in favor of the State.

{¶ 30}   Detective Moore's documentary evidence focused entirely on the deposits into MCG's second account; no documentary evidence was presented as to how the funds were expended.   Although Moore testified that Olson spent the funds on "personal needs, paying off credit cards," and payments on a car, Moore also acknowledged that Olson had incurred legitimate expenses related to MCG.   The officers of the organization testified that Olson often paid these expenses upfront, using his credit cards, and sought reimbursement when the organization had the money to pay him.   The State did not refute the MCG officers' or Olson's assertions that he used his personal credit cards for MCG expenses.

{¶ 31}   Considering this evidence, including the acceptance by all parties that Olson had incurred some "significant legitimate expenses" on his credit cards on behalf of MCG, the MCG officers' assertions that Olson did not owe the organization any money, and the investigation's inability to provide any specific evidence as to how to determine which expenditures from the second account were personal and which related to business, Moore's

conclusory assertion that Olson used *the entire amount* deposited into the account for his personal expenses was not supported by the facts, and it appears internally inconsistent.

{¶ 32} Further, the conclusion that Olson's handling of the Gateway High School check amounted to a theft of the full amount was incorrect. It was undisputed that Olson deposited a check for $2,600 from Gateway into his MCG account, and then wrote a check to MCG for $1,800 on FJM's account to reimburse MCG for the equipment sold to Gateway. In other words, even if Olson misappropriated from MCG the $2,600 attributable to the check from Gateway, MCG received $1,800 from FJM related to that transaction; at most, MCG was deprived of the use of the balance, or $800, and the additional $1,800 was stolen from FJM. MCG was not entitled to restitution of $2,600 for this transaction, because it had not suffered a loss in that amount. Moreover, the unauthorized $1,800 check written by Olson from FJM to MCG was presumably included in the restitution owed to FJM. The court erred in concluding that the full amount of the Gateway check should be included in the calculation of the amount of restitution owed to MCG.

{¶ 33} As stated above, the victim had the burden of proof on its entitlement to restitution. *Johnson*, 164 Ohio App.3d 792, 2005-Ohio-6826, 844 N.E.2d 372 (2d Dist.). The amount of restitution must be supported by competent, credible evidence in the record from which the court can discern the amount of restitution to a reasonable degree of certainty. *State v. Sommer*, 154 Ohio App.3d 421, 2003-Ohio-5022, 799 N.E.2d 559, ¶ 12 (5th Dist.). When the award is not supported by such evidence, it is an abuse of discretion. *State v. Alcala*, 6th Dist. Sandusky No. S-11-026, 2012-Ohio-4318, ¶ 30. *See also State v. Gears*, 135 Ohio App.3d 297, 733 N.E.2d 683 (6th Dist.1999).

**{¶ 34}** In this case, we are presented with an unusual situation in which the officers and former officers of the alleged victim organization, MCG, all testified that they either did not know whether Olson had misappropriated funds or did not believe that he had; the representatives of MCG (the victim under the restitution statute) did not assert that the organization was entitled to any restitution. For his part, Olson argued that he had not misappropriated any funds from MCG, although he pled no contest to grand theft from the organization. The State attempted to prove the organization's loss on the organization's behalf, through Detective Moore's testimony, but Moore overstated the amount owed and did not provide any basis for his conclusions about Olson's expenditures by which this court – or the trial court – could independently evaluate those conclusions. Under these circumstances, we must conclude that the trial court abused its discretion in adopting the amount of restitution suggested by the State.

**{¶ 35}** The second assignment of error is sustained; the order of restitution to MCG will be vacated and the matter will be remanded for a determination of the amount of restitution, if any, due MCG.

**{¶ 36}** Olson's third assignment of error states:

THE TRIAL COURT ABUSED ITS DISCRETION ON ITS JULY 7TH TERMINATION ENTRY, WHEN ORDERING THE DEFENDANT-APPELLANT TO PAY RESTITUTION IN THE AMOUNT OF $2,384.34 TO MID-EAST PERFORMANCE ASSOCIATION.

**{¶ 37}** Olson served as the treasurer for MEPA, a non-profit pageantry association. Detective Moore testified that checks Olson had written on FJM's accounts were

"funnel[ed] through the MEPA" while Olson was treasurer, "basically laundering the FJM money"; Olson then wrote checks from MEPA to himself. Moore's conclusions were based, in part, on conversations with Tim Parker, the president of MEPA, who was unavailable to testify at the restitution hearing. Detective Moore testified to having reviewed with Parker "checks that should not have been issued out of [MEPA's] account"; the total amount of those checks was $44,184.44. The majority of these funds, or $41,800, was traceable to the theft from FJM (and included in restitution to FJM). Moore concluded, however, that the balance of the checks written from the account, or $2,384.44, had been MEPA's money.

{¶ 38} Moore's testimony focused on two checks, although the sum of those checks does not directly correlate to the amount Moore claimed Olson stole from MEPA. State's Exhibit 9 was a check (# 3654) written from MEPA's account to Olson for $1,500, signed by Olson, with the word "Taxes" in the memo section. Detective Moore testified, based on his conversations with Parker, that Exhibit 9 could not have been for the payment of taxes because the organization had 501(c)(3)[3] status. State's Exhibit 10 was a MEPA check (# 3676), written to Olson for $2,000, signed by Olson, with the notation "MEPA Exp" in the memo section. Parker indicated to Moore that there "would never be an even expense like that for $2,000," and that the issuance of this check had not been approved.

{¶ 39} James Miller,[4] past president and vice-president of MEPA during the time

---

[3] Section 501(c)(3) of the Internal Revenue Code, or 26 U.S.C. 501(c)(3).

[4] Two witnesses with the last name of Miller testified at the restitution hearing. All of the references to "Miller" in this opinion refer to James Miller.

of Olson's alleged thefts, testified that he was aware of allegations that Olson had misappropriated money through MEPA, but did not have personal knowledge of those allegations or their veracity. Miller testified that Olson had done "tax preparations" for MEPA and that he would have been entitled to $1,200-$1,500 in payment for those services. Miller testified that check number 3654 for $1,500 (State's Exhibit 9) could have covered those tax preparation services. Miller further testified that check number 3676 for $2,000 (State's Exhibit 10) "very well could be" related to expenses incurred from the "MEPA Experience," a training event which would have occurred a few months before the check was issued.

{¶ 40} Although Parker's conclusions that MEPA check numbers 3654 and 3676 were unauthorized could have been rejected by the court, we cannot conclude that the trial court abused its discretion in weighing the evidence as it did.

{¶ 41} The third assignment of error is overruled.

{¶ 42} The portion of the trial court's judgment that ordered restitution to the Fred J. Miller Corporation will be affirmed in part and reversed in part. The portion ordering restitution to the Miamisburg Color Guard will be vacated, and the portion ordering restitution to the Mid-East Performance Association will be affirmed. The matter will be remanded to the trial court for further proceedings consistent with this opinion.

. . . . . . . . . .

FAIN, P.J. and WELBAUM, J., concur.

Copies mailed to:

Carley J. Ingram

Antony A. Abboud
Hon. Gregory F. Singer