[Cite as *State v. Simmons*, 2017-Ohio-1348.]

## IN THE COURT OF APPEALS OF OHIO

## TENTH APPELLATE DISTRICT

| | | |
|---|---|---|
| State of Ohio, | : | |
| Plaintiff-Appellee, | : | No. 15AP-708 |
| | | (C.P.C. No. 14CR-3193) |
| v. | : | |
| | | (REGULAR CALENDAR) |
| Kimberly K. Simmons, | : | |
| Defendant-Appellant. | : | |

D E C I S I O N

Rendered on April 11, 2017

**On brief:** *Michael DeWine*, Attorney General, *Jonathan L. Metzler*, and *Anil Patel*, for appellee. **Argued:** *Jonathan L. Metzler*.

**On brief:** *Yeura R. Venters*, Public Defender, and *John W. Keeling*, for appellant. **Argued:** *John W. Keeling*.

APPEAL from the Franklin County Court of Common Pleas

BROWN, J.

{¶ 1} Defendant-appellant, Kimberly K. Simmons, appeals from a judgment of the Franklin County Court of Common Pleas finding her guilty of one count of theft by deception, a misdemeanor of the first degree. Because plaintiff-appellee, State of Ohio, filed the indictment within the applicable statute of limitations period, but the trial court awarded restitution for acts the jury did not find defendant guilty of committing, we affirm in part and reverse in part.

{¶ 2} On June 17, 2014, the state indicted defendant on one count of theft by deception, a felony of the fourth degree. The indictment alleged that from January 8, 2010 to February 26, 2014, as part of a course of criminal conduct, defendant knowingly

obtained or exerted control over property or services belonging to the Ohio Department of Medicaid ("ODM"), with a value of $7,500 or more and less than $150,000. The events giving rise to the indictment occurred while defendant was employed by ODM as an independent Medicaid provider.

{¶ 3} ODM provides medical services to Ohio residents who qualify for Medicaid. For individuals "who meet a certain medical need or a certain diagnosis," and might "otherwise be in a facility," ODM can provide funding so the individual can remain in their home. (Tr. Vol. II at 8, 120.) "An independent Medicaid provider" is an individual who has a contract "with the State of Ohio to provide * * * Medicaid services in someone's home." (Tr. Vol. II at 8.) Defendant is a licensed practical nurse, and has been an independent Medicaid provider since 1998. Defendant bills ODM for services she provides to Medicaid recipients by submitting claims to ODM for payment. Defendant's Ohio Medicaid Provider Agreement obligated her to "submit claims only for services actually performed." (State's exhibit 1.)

{¶ 4} ODM receives claims for payment either from the "provider directly or through what is called a trading partner that would transmit the claims stated to the Department." (Tr. Vol. II at 28.) Defendant utilized the trading partner Rhino Bill, LLC. All of the claims submitted by a provider in a given week would be reflected in a document called "[a] remittance advice statement." (Tr. Vol. II at 29.)

{¶ 5} Defendant began providing in-home nursing services to Medicaid recipient Brandon Jennings 15 years ago when Brandon was 7 years old. Brandon suffers from cerebral palsy; he is non-weight bearing, non-verbal, and must be fed through a feeding tube. Brandon also suffers from a seizure disorder. Brandon lives at home with his mother, Kelly Sibert, stepfather, Brian Sibert, and his sister.

{¶ 6} The Mideast Ohio Regional Council ("MEORC") provides case management services for ODM. MEORC began providing case management services for ODM in 2013. Prior to 2013, Carestar, an agency within the Ohio Department of Job and Family Services, administered these services. Kelly Wells, a supervisor at MEORC, explained that in order to determine the amount of services a Medicaid recipient needed, a "case manager [would] do an assessment to determine what the needs of the person are depending on where they live and some of the natural supports they had." (Tr. Vol. II at

96.) Based on that assessment, the case manager would create a plan of care for the Medicaid recipient.

{¶ 7} State's exhibit 5A was the "all-service plan from Carestar that [MEORC] adopted as the individualized service plan" for Brandon. (Tr. Vol. II at 96.) Brandon's all-service plan demonstrates that he was to receive "skilled nursing," so that his primary caregiver, his mother, could "maintain employment and attend her health care needs." (State's exhibit 5A.) Brandon had two nurses, defendant and another nurse named Teresa Hardesty.

{¶ 8} The plan authorized Brandon to receive 72 hours of skilled nursing care per week, consisting of "1 shift of 12 hours for 6 days per week, generally Monday through Saturday 8AM-8PM or 9AM-9PM." (State's exhibit 5A.) Defendant and Hardesty would each work three of the six shifts per week. The plan specified that the nurses were to administer Brandon's G-tube feedings, administer his medications, administer Diastat as needed for seizures, administer oxygen as needed, provide suctioning orally and nasally as needed, administer aerosol treatments as needed, maintain intake/output as ordered, and assist Brandon with his daily living needs.

{¶ 9} Wells explained the nurses could alter their hours, working for example from 6:30 a.m. to 6:30 p.m., and could alter the days they worked, so long as they didn't "go over the total number of bases and said hours for the month." If the nurses were going to go over the base amount of hours, they had to "contact the case manager." (Tr. Vol. II at 101.)

{¶ 10} Nedra Davis, a special agent in the healthcare fraud section of the Ohio attorney general's office, was the lead investigator on the case against defendant. Davis explained that the attorney general's office began its investigation of defendant in 2008, when a former agent of the section, Joe Joseph, went to the Sibert home to interview Kelly Sibert. Joseph noticed that defendant was not present at the home when he was there, although she was scheduled to work at the time. Joseph ordered a video surveillance of the home. The video surveillance ran continuously from April 16 to May 3, 2010. (Tr. Vol. IV at 18-20.)

{¶ 11} Thereafter, Davis took over the investigation. On September 20, 2012, Davis and Special Agent Erin Brantley conducted a physical surveillance of the residence.

The agents arrived at 7:30 a.m. and saw defendant's husband's pick-up truck parked at the residence. The agents ended the surveillance at 5:30 p.m., however, due to "safety concerns" in the neighborhood. (Tr. Vol. III at 11.) Because the agents never saw defendant enter or leave the residence that day, they "didn't make any assumptions as to whether [defendant] was in the home or not." (Tr. Vol. IV at 81.)  Davis ordered another video surveillance of the home, which occurred from November 16 through 29, 2012. However, Davis concluded that the 2012 video was not of "good quality," so she "didn't use it" in her case against defendant. (Tr. Vol. III at 113.)

{¶ 12} Davis reviewed the 2010 surveillance video around "the beginning of 2014," and submitted her summary of the video on May 28, 2014. (Tr. Vol. IV at 77.)  Davis stated that, from her review of the 2010 video, she was able to identify two days where defendant billed ODM for hours she did not work. On February 19, 2014, Brantley and Special Agent George Costner went to defendant's home to interview her. The interview was recorded, and the state played the recording of the interview during trial.

{¶ 13} The agents told defendant during the interview that they had been monitoring both her and the Medicaid recipient's home, and they knew "the hours being billed are not being worked." Brantley told defendant, "there are two people, there's a good person and a bad person," and while the good person would be honest and say "yea, I billed for services I didn't provide," the bad person would deny it. (State's exhibit 8.)

{¶ 14} Defendant explained that over the years she started to feel she was "kind of like on salary." Brantley asked defendant if she ever billed for services she did not provide, and defendant replied, "for a 12 hour shift, maybe I wasn't there the whole 12 hours." Brantley asked defendant how many hours per shift she would actually work, and defendant responded "at least 8, and some days longer." Brantley told defendant she had watched the home, and she saw defendant work for one hour, maybe three to four hours, but never over seven hours. The agents pressed defendant to state on average how many hours per shift she worked. Brantley suggested that defendant was there "at least 50 percent of the time," and defendant responded "yea at least." (State's exhibit 8.)

{¶ 15} Brantley asked defendant if she knew what she had done was wrong, and defendant replied "yea, according to the – the law."  The agents asked defendant if she was willing to pay the money back to ODM, and she replied yes. (State's exhibit 8.)

{¶ 16} Brantley also asked defendant if she ever gave Kelly money, and defendant admitted she had. Defendant explained "like if [Kelly] needed $100," defendant would bill ODM for a full shift, but would not come into work, and would give Kelly $100 cash. Defendant explained that this had been going on for the past nine months, and that in total she had given Kelly $700. Defendant also admitted to forging time sheets for the days she did not work. (State's exhibit 8.)

{¶ 17} Brantley admitted at trial that she never observed defendant entering or leaving the residence and, thus, lied when she told defendant she never saw her work more than seven hours. Davis explained that agents could tell "lies" in order to "elicit the truth from an individual." (Tr. Vol. V at 27.)

{¶ 18} The state presented defendant's remittance advice statements from January 2010 through February 2014. (*See* State's exhibit 2.) The parties stipulated these statements showed defendant had billed for "671 days" during that four-year period. Of those 671 days, there were 120 days where defendant billed for less than 12 hours, and those "billings ranged from * * * 2 hours to 11 and three-quarter hours." (Tr. Vol. II at 59.) The Ohio Office of Budget and Management paid the claims defendant submitted, depositing the funds directly into her bank account.

{¶ 19} The state presented evidence of the joint checking account defendant held with her husband. The account demonstrates that defendant's paychecks were deposited into the account, and that money of various amounts would be taken out of the account at ATMs. (State's exhibit 6A.) Davis admitted that she could not identify which, if any, of these ATM withdraws were at the "specific time [defendant] gave money to Kelly." (Tr. Vol. IV at 123.)

{¶ 20} Davis testified that she reviewed defendant's nursing notes from her shifts, and found that some notes "didn't have in time. Some didn't have an out time. Some didn't - - they didn't cover the 12-hour shift that was billed." (Tr. Vol. IV at 42.) Defense counsel presented Davis with some of defendant's nursing notes, and Davis admitted that, in these particular notes, defendant had "documented the entire shift." (Tr. Vol. IV at 137.)

{¶ 21} Defendant's nursing supervisor, Cheryl Swartzentruber, testified that "Brandon received excellent care from Kim." (Tr. Vol. V at 145.) Swartzentruber noted

that, in her opinion, Brandon required "so much care" that it would have been "very, very hard to pull off" for a nurse to work only eight hours a day and still provide Brandon with good care. (Tr. Vol. V at 150.)

{¶ 22} In calculating the amount of money the state alleged defendant owed ODM, Davis stated that she found "ways to be more conservative." Davis explained that "instead of taking it verbatim[,] her statement that she worked at least 6 hours 50 percent of the time," Davis gave defendant "credit for working 8 hours a day every day." (Tr. Vol. IV at 47.) Thus, if defendant billed for less than 8 hours, Davis gave her credit for the amount she had billed. If defendant billed between 8 and 12 hours, Davis gave her "credit for 8 hours and [took] anything in excess as * * * the theft amount part." (Tr. Vol. IV at 54.) Reviewing defendant's billings from January 1, 2010 to February 18, 2014, Davis concluded the total amount of theft was $54,296.83. (State's exhibit 12.)

{¶ 23} Following a six-day trial, the jury returned a verdict finding defendant guilty of theft by deception. The verdict form instructed the jury that, if their verdict was guilty, they were to further determine the value of the property involved. The verdict form provided the jury with the following options: $7,500 or more and less than $150,000; $1,000 or more and less than $7,500; or less than $1,000. The jury concluded that the value of the property involved was less than $1,000.

{¶ 24} The court held a sentencing hearing on June 25, 2015. The state argued at the hearing that the court should order restitution to ODM in the amount of $54,296.83. Defense counsel argued that the court could not order restitution in an amount greater than $1,000.00, as "the other $53,000 [was] based on charges not convicted." (June 25, 2015 Tr. at 3.) The court reviewed the evidence presented at trial and concluded that defendant had performed "10 hours of actual work per day that you billed for * * * 12." (June 25, 2015 Tr. at 8.) Therefore, the court ordered "restitution in th[e] amount of $27,148.42 to be payable to [ODM]." (June 25, 2015 Tr. at 8-9.)

{¶ 25} The court sentenced defendant to 180 days in jail, suspended 173 days, and placed defendant on a five-year period of community control. The court ordered defendant to pay a fine of $1,000.00, court costs, and $27,148.42 in restitution to ODM.

{¶ 26} Defendant appeals, assigning the following assignments of error for our review:

[I.] THE TRIAL COURT ERRED WHEN IT ENTERED A CONVICTION AND SENTENCE FOR A MISDEMEANOR THEFT OFFENSE WHEN THE STATE FAILED TO PROVE THAT THE OFFENSE WAS COMMITTED WITHIN THE TWO-YEAR LIMITATION FOR THE CRIMINAL PROSECUTION OF A MISDEMEANOR OFFENSE UNDER R.C. 2901.12.

[II.] THE TRIAL COURT ERRED WHEN IT IMPOSED A FINANCIAL SANCTION OF RESTITUTION IN THE AMOUNT OF $27,148.42 AFTER THE DEFENDANT WAS CONVICTED OF MISDEMEANOR THEFT WITH A JURY FINDING THAT THE VALUE OF THE THEFT WAS LESS THAN $1,000.00 AND THE STATE FAILED TO PRESENT ANY EVIDENCE THAT THE VICTIM SUSTAINED ANY ECONOMIC LOSS AS A PROXIMATE RESULT OF THE COMMISSION OF THE THEFT OFFENSE THAT EXCEEDED THE VALUE OF THE THEFT ITSELF, WHICH WAS LESS THAN $1,000.00.

{¶ 27} Defendant's first assignment of error asserts that her theft conviction was barred by the statute of limitations. Defendant filed a pre-trial motion to dismiss the case, asserting that the 2010 surveillance video depicted only misdemeanor conduct which had occurred outside the applicable two-year statute of limitations period. Prior to trial, the court stated that it would hold the motion to dismiss "in abeyance until we get to trial and there's evidence presented in the case that we can then consider that motion." (June 5, 2015 Tr. at 6.) The court did not return to the motion to dismiss during trial. *See State v. Scruggs*, 10th Dist. No. 02AP-621, 2003-Ohio-2019, ¶ 14 (noting that "[w]hen a court fails to rule upon a motion, the motion is generally deemed to have been overruled").

{¶ 28} "Application of a statute of limitations presents a mixed question of law and fact." *Dalesandro v. Ohio Dept. of Transp.*, 10th Dist. No. 10AP-241, 2010-Ohio-6177, ¶ 13. While we accord due deference to a trial court's findings of fact if supported by competent, credible evidence, we review legal issues de novo. *State v. Anderson*, 4th Dist. No. 10CA44, 2012-Ohio-3245, ¶ 56.

{¶ 29} Criminal statutes of limitation "limit exposure to prosecution to a certain fixed period of time following the occurrence of those acts the General Assembly has decided to punish by criminal sanctions." *State v. Climaco, Climaco, Seminatore, Lefkowitz & Garofoli Co. L.P.A.*, 85 Ohio St.3d 582, 586 (1999). "This 'limitation is

designed to protect individuals from having to defend themselves against charges when the basic facts may have become obscured by the passage of time and to minimize the danger of official punishment because of acts in the far-distant past.' " *Id.*, quoting *Toussie v. United States*, 397 U.S. 112, 114-15 (1970). *See also State v. Price*, 10th Dist. No. 98AP-428 (Dec. 22, 1998).

{¶ 30} Generally, "statutes of limitations begin to run when the crime is complete." *State v. Swartz*, 88 Ohio St.3d 131, 133 (2000), citing *Toussie* at 115. *See* R.C. 2901.13(E) (stating that an offense is committed "when every element of the offense occurs"). The "state bears the burden of proving that the offense was committed within the appropriate statute of limitations." *Climaco* at 587.

{¶ 31} The state filed the indictment against defendant on June 17, 2014, alleging that defendant engaged in "a course of criminal conduct" to deprive ODM of property, in violation of R.C. 2913.02(A)(3). R.C. 2913.02(A)(3) provides that "[n]o person, with purpose to deprive the owner of property or services, shall knowingly obtain or exert control over either the property or services * * * [b]y deception." If the value of the property or services stolen under R.C. 2913.02(A) is $7,500 or more but less than $150,000, "a violation of this section is grand theft, a felony of the fourth degree." R.C. 2913.02(B)(2). If the value of the property or services stolen is less than $7,500 but more than $1,000, "a violation of this section is theft, a felony of the fifth degree." R.C. 2913.02(B)(2). If the value of the property or services stolen is less than $1,000, the defendant is guilty of "petty theft, a misdemeanor of the first degree." R.C. 2913.02(B)(2).

{¶ 32} The jury found defendant guilty of theft by deception "as charged in count one of the indictment," but determined that the value of the property involved was less than $1,000. Thus, although the state indicted defendant on fourth-degree felony grand theft, the jury convicted defendant of the lesser-included offense of petty theft, a misdemeanor of the first degree. "A defendant charged with a greater offense cannot be convicted of a lesser included offense if the statute of limitations has expired for the lesser offense." *State v. Adams*, 144 Ohio St.3d 429, 2015-Ohio-3954, ¶ 243, citing *Price*.

{¶ 33} R.C. 2901.13(A) provides that the statute of limitations for a felony, other than murder or aggravated murder, is six years. For a misdemeanor other than a minor misdemeanor, the statute of limitations is two years. R.C. 2901.13(A)(1)(b). Accordingly,

the statute of limitations applicable to defendant's misdemeanor theft conviction was two years.

{¶ 34} Defendant contends that the 2010 surveillance video was the "only misconduct that the state proved." (Appellant's Brief at 18.) After reviewing the 2010 surveillance video, Davis concluded that defendant worked 6 hours and 20 minutes on April 24, 2010, and 5 hours and 6 minutes on April 28, 2010. (State's exhibit 10.) Defendant billed ODM for 12 hours of work each of those days, and Davis thus concluded that defendant billed ODM $273.12 for work she did not perform on those two days. (State's exhibit 12.) Defendant contends the "record clearly demonstrates that the defendant was convicted for misdemeanor conduct occurring in 2010," and that the "jury clearly rejected the evidence the state claimed was obtained from its interrogation of the defendant." (Appellant's Brief at 29.)

{¶ 35} Defendant's contention that the jury relied only on the 2010 surveillance video and rejected all of defendant's statements from the February 19, 2014 interview is pure conjecture. Neither party asked the court to submit interrogatories to the jury pursuant to Civ.R. 49. Accordingly, it is impossible for this court to ascertain the precise evidence the jury relied on to support its verdict. *See Riley v. Cincinnati*, 46 Ohio St.2d 287, 298 (1976) (noting that jury interrogatories may be used to "test the jury's thinking in resolving an ultimate issue"). Regardless, a jury is entitled to "believe all, part or none of a witness's testimony." *State v. Raver,* 10th Dist. No. 02AP-604, 2003-Ohio-958, ¶ 21, citing *State v. Antill*, 176 Ohio St. 61, 67 (1964). Thus, the jury was entitled to believe some of defendant's statements from the February 19, 2014 interview and to reject other statements from the same interview.

{¶ 36} Moreover, the evidence presented at trial provided the jury with several reasons to find the 2010 surveillance video less than credible. Davis testified that the video was of "average quality," and admitted the video was "not crystal clear." (Tr. Vol. III at 117.) The video was in black and white and did not have night vision capability. Davis acknowledged it would be "difficult to identify a person" on the video before sunrise, and stated it was not possible to identify a person's face from the video.  (Tr. Vol. IV at 90.) Additionally, a "known problem" with the video software was that one of the camera

angles would "hang up" or "freeze for a second," and then jump forward to catch up with the other camera. (Tr. Vol. II at 202, 204.)

{¶ 37} Davis noted seeing defendant at the residence on April 23, 24, 27, 28, and 30, 2010, but only "definitely saw the defendant arrive and depart the residence" on April 24 and 28, 2010. (Tr. Vol. V at 34.) For April 24, 2010, Davis' log indicates that at 6:07 p.m., a Chevy Aveo registered to the Simmons arrived "to pick up [a] female[,] and [a] young male exits passenger seat and gets into rear passenger seat while female enters passenger seat." (State's exhibit 10.) Davis testified this was defendant "entering the vehicle" and leaving work for the day. (Tr. Vol. IV at 108.) Caitlyn Simmons, defendant's daughter, reviewed the video in court and identified her boyfriend as the individual getting into the backseat of the Aveo, and herself as the person leaving the home and entering the vehicle. Caitlyn stated that her mom could be seen standing on the porch, she noted her "mom always stood on the porch until I left." (Tr. Vol. V at 225.) Davis admitted there were "many times that activity coming and going from the side door" of the residence was not documented on her log. (Tr. Vol. IV at 112.) Accordingly, defendant's assertion that the jury's verdict was "clearly" based on the 2010 surveillance video lacks merit. (Appellant's Brief at 29.)

{¶ 38} When an element of a crime involves "a continuing course of conduct, the period of limitation does not begin to run until such course of conduct or the accused's accountability for it terminates, whichever occurs first." R.C. 2901.13(E). Thus, a "continuing course of conduct * * * toll[s] the limitations period pursuant to R.C. 2901.13[E]," and so long as "the course of conduct remains under the control of the accused, the statute of limitations does not begin to run." *Swartz* at 134.

{¶ 39} In *State v. Preztak*, 181 Ohio App.3d 106, 2009-Ohio-621 (8th Dist.), the defendant committed a series of theft offenses in her sole capacity as a payroll administrator for a company. The defendant had been "issuing herself 'additional payroll service and fees' between October 15, 1999 and April 4, 2007." *Id.* at ¶ 4. Because the defendant "engaged in a continuing course of conduct by repeatedly stealing money from the same business," pursuant to R.C. 2901.13(E), "the statute of limitations did not commence until the final theft in 2007." *Id.* at ¶ 18. *See also State v. Sevitz*, 3d Dist. No.

1-15-15, 2015-Ohio-5047, ¶ 57; *see State v. Caver*, 8th Dist. No. 91443, 2009-Ohio-1272, ¶ 25.

{¶ 40} Here, the jury convicted defendant of theft by deception "as charged in count one of the indictment." The indictment alleged that defendant had committed theft by deception as part of a continuous course of conduct. Accordingly, R.C. 2901.13(E) tolled the statute of limitations until defendant's course of conduct or her accountability for it terminated.

{¶ 41} During the February 19, 2014 interview, defendant admitted that she billed ODM for hours she did not work. Accordingly, defendant's course of conduct, of billing ODM for work she did not perform, continued until her interview with special agents on February 19, 2014. The statute of limitations was therefore tolled until February 19, 2014. As such, the June 17, 2014 indictment was filed well within the two-year misdemeanor statute of limitations period.

{¶ 42} Based on the foregoing, defendant's first assignment of error is overruled.

{¶ 43} Defendant's second assignment of error asserts the trial court erred by ordering defendant to pay $27,148.42 in restitution to ODM.

{¶ 44} Restitution is a financial sanction available at sentencing. R.C. 2929.28 governs misdemeanor financial sanctions, including restitution. The statute provides that a court may order restitution "to the victim of the offender's crime * * * in an amount based on the victim's economic loss." R.C. 2929.28(A)(1). R.C. 2929.01(L) defines "economic loss" to mean "any economic detriment suffered by a victim as a direct and proximate result of the commission of an offense," and specifically includes "any loss of income due to lost time at work because of any injury caused to the victim, and any property loss, medical cost, or funeral expense incurred as a result of the commission of the offense." The trial court may base the amount of restitution "on an amount recommended by the victim, the offender, a presentence investigation report, estimates or receipts indicating the cost of repairing or replacing property, and other information." R.C. 2929.28(A)(1). However, "the amount the court orders as restitution shall not exceed the amount of the economic loss suffered by the victim as a direct and proximate result of the commission of the offense." R.C. 2929.28(A)(1).

{¶ 45} We review a trial court's restitution order for an abuse of discretion. *State v. Jones*, 10th Dist. No. 14AP-80, 2014-Ohio-3740, ¶ 22, citing *State v. Norman*, 10th Dist. No. 12AP-505, 2013-Ohio-1908, ¶ 67. *See Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219 (1983). " 'A trial court abuses its discretion when it orders restitution in an amount that has not been determined to bear a reasonable relationship to the actual loss suffered as a result of the defendant's offense.' " *Jones* at ¶ 22, quoting *State v. Aliane*, 10th Dist. No. 03AP-840, 2004-Ohio-3730, ¶ 15. *See also State v. Moore-Bennett*, 8th Dist. No. 95450, 2011-Ohio-1937, ¶ 18.

{¶ 46} "The evidence supporting a restitution order can be either documentary or testimonial evidence." *State v. Jones*, 10th Dist. No. 15AP-45, 2015-Ohio-3983, ¶ 14. The record must contain "competent and credible evidence * * * from which the court may ascertain the amount of restitution to a reasonable degree of certainty." *Norman* at ¶ 66. While the "trial court is under no duty to itemize or otherwise explain how it arrived at the amount of restitution it orders," the court must "discern the amount of restitution to a reasonable degree of certainty from competent, credible evidence in the record." *State v. Perkins*, 3d Dist. No. 9-13-52, 2014-Ohio-2242, ¶ 23.

{¶ 47} "[R]estitution can be ordered only for those acts that constitute the crime for which the defendant was convicted and sentenced." *State v. Hooks*, 135 Ohio App.3d 746, 749 (10th Dist.2000). Thus, a defendant "cannot be ordered to pay restitution for damages attributed to an offense for which the offender was charged, but not convicted." *State v. Strickland*, 10th Dist. No. 08AP-164, 2008-Ohio-5968, ¶ 11. *See State v. Guade*, 10th Dist. No. 11AP-718, 2012-Ohio-1423, ¶ 12 (finding the trial court "abused its discretion by ordering restitution for [the victim's] medical expenses because they [were] based on the assault and disorderly conduct charges for which [defendant] was acquitted"); *State v. Maddox*, 8th Dist. No. 102133, 2015-Ohio-2859, ¶ 15 (finding that the trial court abused its discretion by ordering restitution for the cost of tools the victim alleged, for the first time at sentencing, were located in the stolen vehicle, as the defendant "was neither charged nor convicted of any crime related to these tools").

{¶ 48} In *State v. Lalain*, 136 Ohio St.3d 248, 2013-Ohio-3093, the Supreme Court of Ohio held that R.C. 2929.18(A)(1), the felony sentencing counterpart to R.C. 2929.28(A)(1), "gives a sentencing court discretion to order restitution but not in an

amount greater than the amount of economic loss suffered by the victim as a direct and proximate result of the commission of the offense." *Id.* at ¶ 3. In *Lalain*, the defendant was indicted on one count of first-degree felony theft of property worth over $1 million, and pled guilty to one count of fifth-degree felony theft of property worth $500 or more but less than $5,000. Aero-Instruments, the victim of the defendant's theft and his former employer, presented evidence demonstrating it spent $7,665 to hire a forensic accounting firm and $55,456 to pay its own employees to identify and value the stolen property. The trial court awarded Aero-Instruments $63,121 in restitution.

{¶ 49} The Supreme Court observed that, while the restitution statute "allows the court to base the amount of restitution on * * * a presentence investigation report, estimates or receipts indicating the cost of repairing or replacing property, and other information, it does not provide restitution for the costs of preparing such a report." *Id.* at ¶ 22. Accordingly, the costs Aero-Instruments expended to identify and value the stolen property were not a "direct and proximate result of the commission of the theft offense; rather, they are consequential costs incurred subsequent to the theft to value the property that had been taken from and later returned to Aero-Instruments." *Id.* at ¶ 25. *Compare State v. Jackson*, 1st Dist. No. C-140573, 2015-Ohio-3742, ¶ 7; *State v. Plants*, 8th Dist. No. 101552, 2014-Ohio-5293, ¶ 5.

{¶ 50} The Supreme court further stated that it "recognize[d] that the amount of restitution is not correlated to the degree of the theft offense." *Lalain* at ¶ 24. The court noted, as an example, that a trial court choosing to order "restitution in a case of grand theft of a motor vehicle is not restricted to the value corresponding to a fourth-degree felony" and could "instead award restitution pursuant to R.C. 2929.18(A)(1)." *Id.* The court in *Lalain* concluded that the trial court "lacked authority to order $63,121 in restitution," noting that "[a]t a minimum, the trial court should have conducted a hearing" after the defendant disputed the amount of restitution. *Id.* at ¶ 25.

{¶ 51} In the instant case, the state filed a request for restitution following trial. Citing *Lalain*, the state asserted the court was not limited to ordering restitution in an amount less than $1,000. The state stated that, "although the jury returned a verdict that Defendant committed Theft in an amount under $1,000.00, that verdict was based on the reasonable doubt standard," but in determining restitution, "the proper burden is by a

'preponderance of the evidence.' " (State's Request for Restitution at 3.) The state argued the evidence "warranted, beyond a preponderance of the evidence, a $54,296.83 restitution order" as the evidence demonstrated that defendant worked only "eight hours for each service date." (State's Request for Restitution at 3.)

{¶ 52} The court concluded that restitution was "by a preponderance of the evidence. And what the jury was to consider was beyond a reasonable doubt. So it is a lower level burden of proof for the Court in determining what the restitution is in this case." The court found "plenty of testimony * * * on the amount of the theft in this case," noting Davis' testimony and defendant's nursing notes. The court noted that, while it was "not convinced by a preponderance of the evidence that the full amount of the $54,000 is appropriate," the court did find "multiple progress notes where [defendant worked] between 8 to 10 hours on various days but billed for 12." (June 25, 2015 Tr. at 8.) Accordingly, the court decided that the "more appropriate amount is to use the 10 hours of actual work per day that you billed for the 12. So I am making the restitution in the amount of $27,148.42." (June 25, 2015 Tr. at 8-9.)

{¶ 53} Defendant argues that the court's restitution order "is not limited to the actual economic loss caused by the illegal conduct for which the defendant was convicted," as it imposes restitution for "conduct the defendant was actually acquitted of." (Appellant's Brief at 43-44.) We agree.

{¶ 54} The sentencing transcript reveals the trial court determined the amount of restitution by reviewing the trial record under a preponderance of the evidence standard and determining which acts the court found defendant guilty of committing under that lesser degree of proof. This was error. Restitution "is limited to the actual loss caused by the defendant's criminal conduct for which he [or she] was convicted." *Norman* at ¶ 66, citing *State v. Blay*, 10th Dist. No. 10AP-247, 2010-Ohio-4749, ¶ 7. *See also Columbus v. Martin*, 10th Dist. No. 11AP-937, 2012-Ohio-2654, ¶ 7; *State v. Ganguly*, 10th Dist. No. 14AP-383, 2015-Ohio-845, ¶ 31; *Columbus v. Wood*, 10th Dist. No. 15AP-1105, 2016-Ohio-3081, ¶ 10, 12.

{¶ 55} The restitution statute provides that the trial court must hold a hearing on restitution "if the offender, victim, or survivor disputes the amount of restitution." R.C. 2929.28(A)(1). "If the court holds an evidentiary hearing, at the hearing the victim or

survivor has the burden to prove by a preponderance of the evidence the amount of restitution sought from the offender."  R.C. 2929.28(A)(1).  *See State v. Olson*, 2d Dist. No. 25452, 2013-Ohio-4403, ¶ 33 (holding that "the victim ha[s] the burden of proof on its entitlement to restitution").

{¶ 56} Thus, R.C. 2929.28 specifies that it is the victim's, or the survivor's, burden to prove at the evidentiary hearing the economic loss they have suffered by a preponderance of the evidence. The restitution statute does not permit a trial court to review the record under a preponderance of the evidence standard, and to award restitution for acts the court believes the defendant committed under that lesser degree of proof.  To do so would permit the court to award restitution for acts the defendant was not convicted of committing. Rather, the court must base the amount of restitution on the criminal conduct the defendant was convicted of committing, and the economic loss the victim or survivor suffered as a direct and proximate result of that conduct.

{¶ 57} Here, the jury convicted defendant of theft of less than $1,000. As jury interrogatories were not utilized in the instant case, it is impossible for this court to know the precise acts the jury relied on to support its verdict.  *See Gary Moderalli Excavating, Inc. v. Trimat Constr., Inc.*, 5th Dist. No. 2012 AP 03 0022, 2013-Ohio-1701, ¶ 53 (observing that "[w]ithout interrogatories, there is nothing before this Court to indicate why the jury found as it did").

{¶ 58} Regardless, the jury's verdict demonstrates the jury did not convict defendant of performing only ten hours of work per shift. If the jury had found defendant guilty of working only ten hours per shift, they would have determined the value of the theft was $27,148.42. *Compare State v. Daniels*, 1st Dist. No. C-150042, 2015-Ohio-5348, ¶ 27 (where the defendant pled guilty to misdemeanor theft, and the trial court ordered $1,950 in restitution based on testimony that the value of the stolen property was $1,950, the appellate court reversed noting that, while the property owner could "seek more than" $1,000 in restitution, "in doing so, he could not properly seek to *increase the replacement value* of the property, as that would have resulted in Daniels's conviction for a different offense"). (Emphasis sic.) *Id.* at ¶ 31. Accordingly, the court imposed restitution for acts the jury did not find defendant guilty of committing.

{¶ 59} Thus, the trial court was limited to ordering restitution for the economic loss ODM suffered as a direct and proximate result of defendant's theft of less than $1,000. Pursuant to *Lalain*, the amount of restitution was not restricted to the degree of the offense. Thus, the court was entitled to order restitution in an amount greater than $999, but only if it had competent and credible evidence demonstrating that the amount ordered corresponded to economic loss ODM suffered as a proximate result of defendant's theft of less than $1,000.[1] *Compare Perkins* at ¶ 26 (noting that, even if a victim's property is returned to them, the victim could recover other costs in restitution, "such as costs to rent replacement property until the stolen property was returned").

{¶ 60} ODM, however, did not present evidence demonstrating the economic loss it incurred as a direct and proximate result of defendant's conviction. Indeed, ODM did not present any evidence at the sentencing hearing. *See State v. Watters*, 7th Dist. No. 13 MA 151, 2014-Ohio-2943, ¶ 13-14 (observing that, as the "victim did not appear at the sentencing hearing and the state did not present any documentation on his behalf to demonstrate economic loss," it was "impossible for the trial court to order restitution in an amount that bore any reasonable relationship to the actual loss suffered").

{¶ 61} Thus, while restitution is not restricted to the degree of the offense, restitution is restricted to the economic loss the victim or survivor suffers as a direct and proximate result of the criminal conduct the defendant is convicted of committing. *Lalain*; R.C. 2929.28(A)(1). The $27,148.42 restitution order in the instant case was not based on the economic loss ODM suffered as a direct and proximate result of defendant's theft of less than $1,000.00. Rather, the trial court ordered $27,148.42 in restitution based on the court's conclusion that defendant had worked ten hours each shift. Accordingly, the trial court ordered restitution for acts the jury did not find defendant guilty of committing. The trial court's restitution order therefore amounts to an abuse of discretion.

{¶ 62} Based on the foregoing, defendant's second assignment of error is sustained.

---

[1] For example, if defendant had physically broken into ODM's offices and stolen $999, and damaged a door worth $1,000 while doing so, defendant would be guilty of misdemeanor theft, but the court could order $1,999 in restitution.

{¶ 63} Having overruled defendant's first assignment of error, but having sustained defendant's second assignment of error, the judgment of the Franklin County Court of Common Pleas is affirmed in part, reversed in part, and this matter is remanded to that court for further proceedings in accordance with law consistent with this decision.

*Judgment affirmed in part and reversed in part;*
*cause remanded.*

KLATT and BRUNNER, JJ., concur.

_____