[Cite as *State v. Baldwin*, 2021-Ohio-4566.]

# IN THE COURT OF APPEALS OF OHIO
## THIRD APPELLATE DISTRICT
## UNION COUNTY

STATE OF OHIO,

    PLAINTIFF-APPELLANT,

    CASE NO. 14-21-05

v.

STEFFEN EVAN BALDWIN,

    O P I N I O N

    DEFENDANT-APPELLEE.

Appeal from Union County Common Pleas Court
Trial Court No. 20-CR-0099

**Judgment Affirmed**

**Date of Decision:  December 27, 2021**

APPEARANCES:

    *Melissa A. Chase* **for Appellant**

    *Holly B. Cline, Michael J. Streng and Jonathan T. Tyack* **for Appellee**

**WILLAMOWSKI, P.J.**

{¶1} The State of Ohio appeals the judgment of the Union County Court of Common Pleas, arguing that the statute of limitations did not bar prosecution of fourteen misdemeanor counts that were charged against the defendant-appellee, Steffen E. Baldwin ("Baldwin"). For the reasons set forth below, the judgment of the trial court is affirmed.

*Facts and Procedural History*

{¶2} Before February of 2018, Baldwin was affiliated with a number of dog rescue and training operations in Ohio, including ACT Ohio Humane Society ("ACT Ohio") and Save In Dog Training. Vol. I Tr. 62. Vol. II Tr. 36. Baldwin had a reputation as a "rehabilitator of dogs." Vol. I Tr. 55. In particular, he advertised his ability to work with "dogs that had behavioral issues * * * that nobody else wanted to touch but him." *Id*. He claimed, on social media, to have "a 99 percent success rate," having helped "at least 250 behavioral[ly] challenged dogs." *Id*. Baldwin would raise funds online that were purportedly going to be used to rescue dogs that were going to be euthanized if their behavioral issues were not addressed. *Id*. at 55-56.

{¶3} Baldwin was also a "lead advocate in Ohio" of the "no kill" policy for animal shelters and even travelled to Austin, Texas to speak at a conference that sought to promote "no kill" policies. Vol. II Tr. 36. At this conference in Austin, Baldwin became acquainted with Dr. Saskia Boiso ("Dr. Boiso"), who was an

animal rights advocate and medical doctor living in San Diego, California. *Id*. at 81. Dr. Boiso was occasionally in contact with Baldwin after they met in Texas and referred his services to the owner of a troubled dog in California. *Id*. at 82.

{¶4} In 2016, Baldwin met Litsa and Angelo Kargakos ("the Kargakos"), who had a dog named Remi that had been designated as a dangerous dog. Doc. 57. Vol. I Tr. 20. The Kargakos believed that Baldwin "would get their dangerous dog designation removed and train the dog." Vol. I Tr. 20. However, Baldwin had Remi euthanized on December 28, 2016. Doc. 57. Ex. 5. Baldwin then told the Kargakos that Remi was "alive and living in a foster home." Doc. 57. Ex. 5.

{¶5} By April of 2017, Litsa Kargakos sought a status report on Remi from Baldwin, but he was not responding to her inquiries. Doc. 57. She then sought information from the Union County Dog Warden and found that Remi was not licensed in Union County and had not been registered as a dangerous dog in 2017. Doc. 57. The Kargakos then got into contact with Detective James Conroy ("Detective Conroy"), who worked for the City of Campbell Police Department in Mahoning County, Ohio. Vol. I Tr. 19-20. The Kargakos "believed that Baldwin had fraudulently made promises about what he would do for their dog Rem[i] * * *." Vol. I Tr. 20.

{¶6} The Kargakos lived in the City of Campbell; came to speak with Detective Conroy on June 8, 2017; and filed a complaint regarding Baldwin's activities. Vol. I Tr. 22. Ex. 1. In November of 2017, Detective Conroy helped to

form the ACT Task Force in coordination with the Attorney General's Office and the Ohio Bureau of Criminal Investigation ("BCI") to investigate Baldwin's activities. Vol. I Tr. 24-25, 30. Ex. 1. On December 11, 2017, the ACT Task Force sent a preservation request to Facebook regarding any information that they had from Baldwin's accounts. Ex. 1. On December 13, 2017, members of the ACT Task Force held interviews with Dr. Michelle Gonzalez-Monska ("Dr. Gonzalez-Monska"), who was a veterinarian at the Rascal Animal Hospital ("RAH") in Columbus, Ohio; and with Linda Coffey, who was the Treasurer for ACT Ohio. Ex. 1.

{¶7} On November 8, 2017, Baldwin reached out to Dr. Boiso and informed her that he was moving back to California to be closer to his son's family. Vol. II Tr. 83-84, 94. Dr. Boiso helped make arrangements for Baldwin to come to a ranch near Los Angeles, California where he could continue his dog rescue and training operations. *Id*. at 85-86. She even hired someone to drive a transport vehicle with Baldwin's belongings from Ohio to California and paid the initial rental payment at the ranch where Baldwin was moving. *Id*. at 87, 95. Dr. Boiso testified that Baldwin wanted to move to California by June of 2018 but that this timeline had been moved forward to February to accommodate the schedule of the person who had been hired to drive the transport vehicle.[1] *Id*. at 89, 94-95.

---

[1] In her testimony, Dr. Boiso could not recall for certain why the timeline was moved forward but believed that it was to accommodate the driver's schedule. Vol. II Tr. 95.

{¶8} On January 12, 2018, Detective Conroy became aware that Baldwin intended to relocate when he (Baldwin) posted a message online that announced his plans to move. Vol. I Tr. 28, 30. Ex. 3, 4. In this post, Baldwin further stated that he was going to stop taking appointments in Ohio on February 12, 2018 and would begin taking appointments in Los Angeles on March 1, 2018. Ex. 3, 4. On January 17, 2018, Detective Conroy met with the Union County Prosecutor to update him about the investigation into Baldwin. Vol. I Tr. 30. Ex. 1. The ACT Task Force then served a search warrant on Facebook for information from Baldwin's personal account and the ACT Ohio account. Ex. 1.

{¶9} At 11:40 A.M. on February 7, 2018, Detective Conway received a report from the Union County Dog Warden that there was a moving truck on Baldwin's driveway. Vol. I Tr. 32. Ex. 1. Members of the ACT Task Force then obtained a search warrant for Baldwin's residence. *Id*. at 33. Law enforcement began searching Baldwin's property at roughly 8:30 P.M and concluded at 2:30 A.M. *Id*. at 34-35. Ex. 1. When Baldwin learned of the search warrant, he called his friend, Anthony W. Eufinger ("Eufinger"), who is an attorney in Marysville, Ohio. *Id*. at 35-36. Vol. II Tr. 106-107. Both Baldwin and Eufinger were present for the duration of the search. Vol. I Tr. 35-36.

{¶10} On February 8, 2018, Baldwin left for Los Angeles, California, bringing a number of dogs with him. Vol. I Tr. 37, 62. Vol. II Tr. 84. Ex. 1. On a ranch in the Los Angeles area, Baldwin continued to operate Save In Dog Training

as "a for profit business." Vol. I Tr. 62. He also formed a nonprofit organization called Underdog Alliance in partnership with Dr. Boiso. Vol. II Tr. 90. Baldwin lived on the ranch where he operated his dog rescue and training operations. Vol. I Tr. 62.

{¶11} On April 9, 2018, BCI completed the extraction of the data from Baldwin's Facebook accounts and transferred these files to Detective Conroy. Vol. I Tr. 39. Ex. 1. There were almost 438,000 messages from Baldwin's personal Facebook account and almost 5,000 messages from his ACT Ohio Facebook account. Vol. I Tr. 39-40. Ex. 1. Detective Conroy was able to read through these messages in between April 15, 2018 and July 17, 2018. Ex. 1. However, he testified that he discovered most of the charges in between January and October of 2019. Vol. I Tr. 47.[2] During his investigation, he discovered evidence that indicated eighteen dogs had been euthanized. *Id.* at 58.

{¶12} In February of 2019, Baldwin hired Rhys Cartwright-Jones ("Cartwright") to represent him as his attorney in this case. Vol. I Tr. 65. In July of 2019, Cartwright's partner approached Detective Conroy to inquire about the status of the Baldwin investigation. *Id.* Detective Conroy testified that he did not divulge any information about the investigation and that Cartwright's partner

---

[2] In his written timeline, Detective Conroy states that he discovered "almost all the charges outside of the charges associated with 'Remi'" in between January 12, 2019 and March 29, 2019. Ex. 1. At the hearing, Detective Conroy testified that he began writing actual police reports in late March of 2019; that he wrote a total of twenty-nine reports; that sixteen of these reports suggested criminal charges; and that he submitted the last of these reports in October of 2019. Vol. I Tr. 47.

"offered to bring Baldwin back from California." *Id.* Detective Conroy rejected this offer because he was not sure whether Cartwright's partner could speak as Baldwin's attorney and because the case against Baldwin was not yet ready to proceed to the grand jury. *Id*. at 66.

{¶13} On December 10, 2019, Detective Conroy met with the Union County Prosecutor's Office to discuss his findings and the potential charges. Vol. I Tr. 48. A grand jury was convened on June 18, 2020. *Id*. On June 19, 2020, the grand jury returned an indictment against Baldwin that contained forty-two charges. Doc. 1. Twenty-eight of these charges were felonies and fourteen of these charges were misdemeanors. Doc. 1.

{¶14} The felony charges included fifteen counts of telecommunications fraud in violation of R.C. 2913.05(A); six counts of tampering with records in violation of R.C. 2913.42(A); three counts of grand theft in violation of R.C. 2913.02(A); two counts of cruelty to companion animals in violation of R.C. 959.131(E)(1); one count of bribery in violation of R.C. 2921.02(B); and one count of engaging in a pattern of corrupt activity in violation of R.C. 2923.32(A). Doc. 1.

{¶15} The misdemeanor charges included seven counts of cruelty to companion animals in violation of R.C. 959.131(E)(4); four counts of cruelty to companion animals in violation of R.C. 959.131(E)(1); one count of falsification in violation of R.C. 2921.13(A)(3); one count of falsification in violation of R.C. 2921.13(A)(10); and one count of impersonation of a peace officer in violation of

R.C. 2921.51(B). Doc. 1. In this indictment, the State alleged that these fourteen misdemeanors had been committed in between November 5, 2012 and December 15, 2017. Doc. 1.

{¶16} On July 23, 2020, Baldwin was arrested in California and returned back to Ohio. Vol. I Tr. 49. Ex. 1. On September 14, 2020, Baldwin filed a motion to dismiss the fourteen misdemeanor counts in the indictment, arguing that these charges were not filed within the applicable two-year statute of limitations for misdemeanors set by R.C. 2901.13(A)(1)(b). Doc. 39. The trial court held hearings on this motion on December 16, 2020 and January 8, 2021. Vol. I Tr. 1. Vol. II Tr. 1. On February 1, 2021, the trial court granted Baldwin's motion and dismissed the fourteen misdemeanor charges against him on the grounds that the indictment was filed outside of the applicable statute of limitations. Doc. 71.

{¶17} The State filed its notice of appeal on March 3, 2021. Doc. 73. On appeal, the State raises the following three assignments of error:

### First Assignment of Error

**The Trial Court erred in applying the law to the facts when it found that the Defendant, Steffen Evan Baldwin, was not engaged in a continuing course of criminal conduct which tolled the statute of limitations for the misdemeanors of the first degree in the Indictment pursuant to R.C. 2901.13(E).**

### Second Assignment of Error

**The Trial Court erred in applying the law to the facts when it found that the discovery of the corpus delicti of these offenses was more than two years before March 9, 2020.**

**Third Assignment of Error**

**The Trial Court erred in applying the law to the facts when it found that the Defendant, Steffen Evan Baldwin, did not flee the State of Ohio to avoid prosecution which tolled the two-year statute of limitations for the misdemeanors of the first degree in the Indictment, pursuant to R.C. 2901.13(H).**

For clarity, we will set forth the legal standard that governs the statute of limitations generally before we proceed to examining each of the State's assignments of error.

*Legal Standard for the Statute of Limitations*

{¶18} The purpose of a statute of limitations is "to discourage inefficient or dilatory law enforcement rather than to give offenders the chance to avoid criminal responsibility for their conduct." *State v. Climaco, Climaco, Seminatore, Lefkowitz & Garofoli Co., L.P.A.*, 85 Ohio St.3d 582, 586, 1999-Ohio-408, 709 N.E.2d 1192, 1195 (1999). These provisions are to "be strictly construed against the state, and liberally construed in favor of the accused." *State v. Swartz,* 88 Ohio St.3d 131, 133, 2000-Ohio-277, 723 N.E.2d 1084, 1086 (2000), quoting R.C. 2901.04(A).

{¶19} "The state bears the burden of proving that the prosecution was commenced within the [applicable] * * * statute of limitations." *State v. Gallant*, 174 Ohio App.3d 264, 2007-Ohio-6714, 881 N.E.2d 907, ¶ 13 (3d Dist.).

**'[a]pplication of a statute of limitations presents a mixed question of law and fact.' *Dalesandro v. Ohio Dept. of Transp*., 10th Dist. No. 10AP-241, 2010-Ohio-6177, 2010 WL 5238609, ¶ 13. While we accord due deference to a trial court's findings of fact if supported by competent, credible evidence, we review legal issues**

**de novo.** *State v. Anderson*, **4th Dist. No. 10CA44, 2012-Ohio-3245, 2012 WL 2928537, ¶ 56.**

*State v. Simmons*, 2017-Ohio-1348, 88 N.E.3d 651, ¶ 28 (10th Dist.). *See State v. Pannell,* 2017-Ohio-4286, 92 N.E.3d 280, ¶ 16 (5th Dist.); *State v. Cook*, 184 Ohio App.3d 382, 2009-Ohio-4917, 921 N.E.2d 258, ¶ 25 (6th Dist.); *Cleveland v. Bermudez*, 8th Dist. Cuyahoga No. 109018, 2020-Ohio-4296, ¶ 6. *See also Schmitz v. National Collegiate Athletic Association*, 155 Ohio St.3d 389, 2018-Ohio-4391, 122 N.E.3d 80, ¶ 11.

{¶20} "In Ohio, R.C. 2901.13 sets forth the various limitations periods for criminal prosecutions." *Swartz* at 133. R.C. 2901.13 reads, in its relevant part, as follows:

> **(A)(1) Except as provided in division (A)(2), (3), or (4) of this section or as otherwise provided in this section, a prosecution shall be barred unless it is commenced within the following periods after an offense is committed:**
>
> **(a) For a felony, six years;**
>
> **(b) For a misdemeanor other than a minor misdemeanor, two years;**
>
> **(c) For a minor misdemeanor, six months.**

R.C. 2901.13(A)(1). Accordingly, the State must, as a general matter, commence a criminal prosecution within the two years after a misdemeanor offense has been committed. *Id.*

{¶21} R.C. 2901.13 further explains when a prosecution has been commenced and when an offense has been committed. "A prosecution is commenced on the date an indictment is returned or an information filed, or on the date a lawful arrest without a warrant is made, or on the date a warrant, summons, citation, or other process is issued, whichever occurs first." R.C. 2901.13(F). Further, "[a]n offense is committed when every element of the offense occurs." R.C. 2901.13(E). Thus, the statute of limitations generally "begin[s] to run when the crime is complete." *Swartz, supra,* at 133.

{¶22} However, R.C. 2901.13(E), R.C. 2901.13(G), and R.C. 2901.13(H) also contain provisions that set forth conditions that toll the running of the statute of limitations. *Swartz, supra*, at 134; *State v. Cook*, 128 Ohio St.3d 120, 2010-Ohio-6305, 942 N.E.2d 357, ¶ 1; *State v. Rue*, 164 Ohio St.3d 270, 2020-Ohio-6706, 172 N.E.3d 917, ¶ 41. The State bears the burden of establishing whether the statute of limitations was tolled. *State v. Hatfield*, 4th Dist. Athens No. 1413, 1990 WL 54884, *5 (Apr. 19, 1990); *Gallant, supra*, at ¶ 13.

*Discussion of the Assignments of Error*

{¶23} At issue in this appeal are fourteen misdemeanor charges that are subject to a two-year statute of limitations. R.C. 2901.13(A)(1)(b). Further, the instant prosecution was commenced when the indictment against Baldwin was returned on June 19, 2020. Doc. 1. None of these fourteen offenses were committed within the two years immediately preceding June 19, 2020. Doc. 1. However, the

State argues that the two-year statute of limitations for the fourteen misdemeanor offenses at issue in this appeal should have been tolled pursuant to R.C. 2901.13(E), R.C. 2901.13(G), and R.C. 2901.13(H) in its first, second, and third assignments of error respectively. We turn now to examining the State's arguments.

*First Assignment of Error*

{¶24} The State argues that Baldwin engaged in a continuing course of conduct and that, pursuant to R.C. 2901.13(E), the statute of limitations should have been tolled until the date of his arrest. Appellant's Brief, 13.

Legal Standard

{¶25} The statute of limitations generally "begin[s] to run when the crime is complete." *Swartz, supra*, at 133. However, R.C. 2901.13(E) also states that,

> **[i]n the case of *an* offense of which an element is a continuing course of conduct, the period of limitation does not begin to run until such course of conduct or the accused's accountability for it terminates, whichever occurs first.**

(Emphasis added.) R.C. 2901.13(E). Of relevance to R.C. 2901.13(E) is whether the offense is "of a continuing nature" or the offense is one "involving a particular act under particular circumstances at a particular time." *State v. Manns*, 3d Dist. Hardin Nos. 6-79-8, 6-79-9, 1980 WL 352044, *2 (Mar. 21, 1980).

Legal Analysis

{¶26} The State argues that the statute of limitations for these fourteen misdemeanor charges should have been tolled pursuant to R.C. 2901.13(E) until he

was arrested on July 23, 2020. Vol. I Tr. 49. Ex. 1. Initially, we note that Baldwin was charged with fourteen separate and distinct misdemeanor counts. *State v. Jones*, 5th Dist. Licking No. 2007-Ohio-CA-63, 2008-Ohio-2550, ¶ 24; *State v. Rodriguez*, 8th Dist. Cuyahoga No. 89198, 2007-Ohio-6835, ¶ 25; *State v. Preztak*, 181 Ohio App.3d 106, 2009-Ohio-621, 907 N.E.2d 1254, ¶ 18 (8th Dist.). *But see State v. Caver*, 8th Dist. Cuyahoga No. 91443, 2009-Ohio-1272, fn. 7.

{¶27} Further, ten of these misdemeanor charges were alleged to have been completed "on or about a specific day" and were not alleged to have been committed over a period of time. *Manns, supra*, at *2. *Cook, supra*, 2009-Ohio-4917, at ¶ 47. These ten charges were "each a discrete act" that was alleged to have been committed more than two years before Baldwin's indictment was filed on June 19, 2020. *State v. Gravelle*, 6th Dist. Huron Nos. H-06-042, H-06-043, H-06-044, and H-06-045, 2008-Ohio-4031, ¶ 41, citing *Rodriguez* at ¶ 25. Thus, these ten charges were "not * * * of a continuing nature but [each] * * * involv[ed] a particular act under particular circumstances at a particular time." *Mann, supra*, at *2. *State v. Meadows*, 11th Dist. Trumbull No. 2012-T-0048, 2013-Ohio-1742, ¶ 42 (considering the "continuing nature of the violation" in determining whether R.C. 2901.13(E) tolled the statute of limitations).

{¶28} The four remaining misdemeanor charges in the indictment were alleged to have occurred over a period of time. Doc. 1. However, these four offenses—Counts Seven, Fourteen, Twenty-Nine, and Thirty-Five—were alleged

to have been completed by April 13, 2017; December 15, 2015; August 21, 2015; and July 20, 2016 respectively. Doc. 1. Thus, even if the statute of limitations was tolled under R.C. 2901.13(E), these offenses were still completed more than two years before Baldwin was indicted. Doc. 1. *See State v. Betts*, 4th Dist. Vinton No. 18CA710, 2018-Ohio-2720, ¶ 5; *State v. Scruggs*, 8th Dist. Cuyahoga No. 94518, 2010-Ohio-5604, ¶ 17-18; *Simmons*, *supra*, at ¶ 41.

{¶29} In conclusion, the State has not, with its arguments predicated on R.C. 2901.13(E), carried the burden of establishing that these fourteen misdemeanor charges were filed within the applicable two-year statute of limitations. For this reason, the State's first assignment of error is overruled.

*Second Assignment of Error*

{¶30} Pursuant to R.C. 2901.13(G), the State argues that the trial court erred in determining that the corpora delicti of these fourteen misdemeanor offenses were discovered outside of the two-year statute of limitations.

Legal Standard

{¶31} R.C. 2901.13(G) states that "[t]he period of limitation shall not run during any time when the corpus delicti remains undiscovered." R.C. 2901.13(G). "The corpus delicti of a crime is the body or substance of the crime and usually has two elements: (1) the act itself and (2) the criminal agency of the act." *Cook*, 128 Ohio St.3d 120, at the first paragraph of the syllabus.

> **In cases other than those involving child abuse, discovery of the corpus delicti occurs 'when any competent person other than the wrongdoer or someone * * * [equally at fault] with him has knowledge of both the act and its criminal nature * * *.'**

*State v. Cleavenger*, 11th Dist. Portage No. 2019-P-0036, 2020-Ohio-73, ¶ 26, quoting *State v. Beck*, 2016-Ohio-8122, 75 N.E.3d 899, ¶ 13 (1st Dist.), quoting *Hensley*, 59 Ohio St.3d 136, 137, 571 N.E.2d 711, 712 (1991). Further,

> **The Supreme Court has specifically rejected the notion the statute of limitations begins to run under R.C. 2901.13([G]) 'only when the prosecutor or other law enforcement agencies discover the corpus delicti of the crime.'**

*State v. Price*, 10th Dist. Franklin Nos. 98AP-428, 98AP-457, 1998 WL 896358, *2 (Dec. 22, 1998), quoting *Hensley* at 139.[3] The State bears the burden of establishing the applicability of R.C. 2901.13(G). *Hatfield, supra*, at *5.

Legal Analysis

**{¶32}** Baldwin was charged with these fourteen misdemeanors on June 19, 2020. Doc. 1. Thus, if the evidence in the record establishes that the corpus delicti for any of these alleged misdemeanor offenses was discovered at any point in time that was more than two years before June 19, 2020, that charge is barred by the applicable two-year statute of limitations.

---

[3] In 2015, the General Assembly amended R.C. 2901.13, inserting section R.C. 2901.13(D) into this provision. R.C. 2901.13. Each of the sections that succeeded R.C. 2901.13(D) were re-lettered and shifted down one section. Thus, the contents of former R.C. 2901.13(F) were shifted down to R.C. 2901.13(G) in 2015. The wording of these sections succeeding R.C. 2901.13(D) were not altered during this 2015 revision.

-15-

{¶33} *Count 7: Falsification.* The State alleged that Baldwin made false statements to the dog warden in between April 4, 2017 and April 13, 2017. Doc. 1, 57. The bill of particulars states that Baldwin made these false statements in the process of obtaining dog licenses and that, on April 13, 2017, Baldwin admitted to the dog warden that he had been lying to her. Doc. 57. Further, the Defense introduced an email from April 13, 2017 in which the dog warden discussed the incident involving Remi. Ex. B. This evidence is sufficient to establish that the corpus delicti of the offense that was charged in Count 7 had been discovered more than two years before the indictment was issued on June 19, 2020. Doc. 1.

{¶34} *Count 14: Impersonation of a Peace Officer.* The State alleged that, in between August 12, 2015 and December 15, 2015, Baldwin presented himself as a peace officer even though he had not completed the any of the relevant training and had not received certification to carry a firearm. Doc. 57. In the bill of particulars, the State identified a statement Baldwin completed for the Logan County Sheriff's Office on December 15, 2015 and several Facebook posts from 2015 as the basis of Count 14. Doc. 57.

{¶35} At the hearing, the Defense introduced copies of complaints that were filed with the Logan County Sheriff's Office by three individuals on December 15, 2015. Ex. C. These complaints described Baldwin as behaving aggressively at the Top of Ohio Pet Shelter ("TOPS") while he "had a handgun" and "a vest with a badge on it." Ex. C. In response to these complaints, Baldwin completed a

statement on December 15, 2015 for the Logan County Sheriff's Office in which he

represented the following:

> **I was in uniform as a County Humane Agent, which I have worn many times on the premises with my dual role as the Interim Director of TOPS and a Humane Agent.**
>
> **\* \* \***
>
> **Part of my uniform as a County Humane Agent with police powers to investigate acts of cruelty under Title 9 of the O.R.C. is a firearm worn on the hip.**

Ex. C.   The police report that contained the three complaints and Baldwin's

statement stated that these documents "will be forwarded to the Bellefontaine

Municipal Court Prosecutor for review and determination of charges."  Ex. C.

{¶36} Further, at the hearing, the Defense introduced emails that had been

exchanged between Detective Conroy and Lieutenant Mike Justice ("Lt. Justice")

of the Union County Sheriff's Office.  Vol. I Tr. 82-86.  Ex. D, E.  On February 14,

2018, Detective Conroy asked Lt. Justice to verify whether Baldwin had been

appointed as a peace officer.  Ex. E.  Later that day, Lt. Justice responded by stating

that his office had no record of Baldwin holding any such commission.  Ex. E.  This

evidence is sufficient to establish that the corpus delicti of the offense that was

charged in Count 14 had been discovered more than two years before the indictment

was issued.

{¶37} *Count 15: Falsification*.  The State alleged that, on November 5, 2012,

Baldwin made false statements to the Union County Probate Court ("UCPC") in the

process of seeking to become a humane agent. Doc. 57. The bill of particulars stated that Baldwin had represented to the UCPC that he had obtained degrees from Regis University. Doc. 57. However, on December 7, 2017, Detective Conroy received confirmation from Regis University that Baldwin had not completed a degree program. Vol. I Tr. 86-88. Ex. F. This evidence is sufficient to establish that the corpus delicti of the offense that was charged in Count 15 had been discovered more than two years before the indictment was issued.

{¶38} *Count 18*: *Cruelty to a Companion Animal*. The State alleged that Baldwin needlessly euthanized a dog named Sammy on June 9, 2016. Doc. 57. At the hearing, the Defense introduced an email that Detective Conroy had sent to Dr. Gonzalez-Monska on August 7, 2017 that inquired into whether Sammy had been euthanized. Vol. I Tr. 92. Ex. I. Dr. Gonzalez-Monska replied on August 15, 2017 and informed Detective Conroy that Sammy had not been euthanized at RAH. Ex. I. However, on August 25, 2017, Detective Conroy received confirmation from the Union County Humane Society that Sammy had been euthanized at their facility. Ex. 5. This evidence is sufficient to establish that the corpus delicti of the offense that was charged in Count 18 had been discovered more than two years before the indictment was issued.

{¶39} *Count 20*: *Cruelty to a Companion Animal*. The State alleged that Baldwin needlessly euthanized a dog named Winston on December 4, 2014. Doc. 57. At the hearing, Detective Conroy testified that he obtained confirmation from

RAH on July 26, 2017 that Winston had been euthanized. Vol. I Tr. 96-97. Ex. 5, M. Further, Detective Conroy spoke with Dr. Gonzalez-Monska about Winston in their interview on December 13, 2017. Ex. 5, R. This evidence is sufficient to establish that the corpus delicti of the offense that was charged in Count 20 had been discovered more than two years before the indictment was issued.

{¶40} *Count 23*: *Cruelty to a Companion Animal*. The State alleged that Baldwin had a dog named Titan needlessly euthanized on March 25, 2016. Doc. 57. The Defense introduced a copy of an extensive statement that Titan's owner gave at an interview with Detective Conroy on May 23, 2018. Vol. II Tr. 7-10. Ex. O. This statement detailed the substance of this alleged offense. Ex. O. This evidence is sufficient to establish that the corpus delicti of the offense that was charged in Count 23 had been discovered more than two years before the indictment was issued.

{¶41} *Count 27*: *Cruelty to a Companion Animal*. The State alleged that Baldwin needlessly euthanized a dog named Beretta on November 23, 2015. Doc. 57. At the hearing, Detective Conroy confirmed that he sent an email to Dr. Gonzalez-Monska at the RAH on August 7, 2017 that requested information on Beretta. Vol. II Tr. 10-11. Ex. Q. He specifically requested confirmation as to whether Beretta had been euthanized. Ex. Q. Dr. Gonzalez-Monska responded on August 15, 2017 and emailed Beretta's records to Detective Conroy. Vol. II Tr. 11. Ex. Q. This evidence is sufficient to establish that the corpus delicti of the offense

that was charged in Count 27 had been discovered more than two years before the indictment was issued.

{¶42} *Count 29*: *Cruelty to a Companion Animal*. The State alleged that, in between April 10, 2015 and August 21, 2015, Baldwin caused a dog named Misty to endure unnecessary pain or allowed such pain to continue when there was a reasonable remedy that could provide relief. Doc. 57. The bill of particulars alleges that Misty was diagnosed with a potentially life-threatening disease called Babesiosis during a visit to the RAH on April 8, 2015. The staff at the hospital informed Baldwin that Misty needed to come back to the RAH for further treatment within five to seven days. Doc. 57. However, the State alleged that Baldwin never sought further treatment for Misty. Doc. 57.

{¶43} At the hearing, the Defense produced a copy of Misty's records from RAH. Vol. II Tr. 17. Ex. T. When asked whether Dr. Gonzalez-Monska would have been aware of Misty's condition in April of 2015, Detective Conroy replied, "I would imagine so." Vol. II Tr. 17. Detective Conroy also acknowledged that Dr. Gonzalez-Monska would not have performed any follow-up treatment in 2015 for Misty because Baldwin never brought Misty back as instructed. *Id*. The Defense also noted that Detective Conroy received a copy of Misty's medical history on May 10, 2018. *Id*. at 17-18. Ex. T. This evidence is sufficient to establish that the corpus delicti of the offense that was charged in Count 29 had been discovered more than two years before the indictment was issued.

**{¶44}** *Counts 30 and 32*: *Charges of Cruelty to a Companion Animal.* In the bill of particulars, the State alleged that two dogs ("Misty" and "Roxie") in Baldwin's care got into a fight; that these two dogs each sustained injuries; and that Baldwin did not seek medical treatment for either dog. In Count 30, the State charged Baldwin for allegedly causing Misty to endure unnecessary pain or allowing such pain to continue when there was a reasonable remedy that could provide relief. Doc. 57. In Count 32, the State charged Baldwin for allegedly causing Roxie to endure unnecessary pain or allowing such pain to continue when there was a reasonable remedy that could provide relief. Doc. 57.

**{¶45}** At the hearing, the Defense introduced copies of text messages between Baldwin's girlfriend, Lauren Schnieders ("Schnieders") and Dr. Gonzalez-Monska that were sent on April 23, 2015. Vol. II Tr. 17-18. Ex. U. Schnieders informed Dr. Gonzalez-Monska that Misty and Roxie had been in a fight; that the dogs had been injured; and that the injuries were such that she suggested to Baldwin that the dogs might need to be "put to sleep." Ex. U. Schnieders further stated that she was going to ask Baldwin if he would "let me take one in * * *" for treatment. Ex. U.

**{¶46}** Further, on May 10, 2018, Dr. Gonzalez-Monska confirmed to Detective Conroy that Baldwin did not take Misty or Roxie into RAH for treatment in the wake of the dog fight that occurred on April 23, 2015. Ex. 5. Detective Conroy also received copies of Misty's medical records on May 10, 2018. Ex. 5.

This evidence is sufficient to establish that the corpora delicti of the offenses that were charged in Counts 30 and 32 had been discovered more than two years before the indictment was issued.

{¶47} *Count 33*: *Cruelty to a Companion Animal*. The State alleged that Baldwin needlessly euthanized a dog named Romeo on August 28, 2014. Doc. 57. The record indicates that dog owner was aware, in 2014, that Romeo had been euthanized. Vol. II Tr. 21. Ex. V. Detective Conroy received the records regarding Romeo's authorization from the RAH on July 26, 2017. Ex. V. Further, at the hearing, Detective Conroy testified that he interviewed Romeo's owner on January 22, 2018. Vol. II Tr. 21. This evidence is sufficient to establish that the corpus delicti of the offense that was charged in Counts 33 had been discovered more than two years before the indictment was issued.

{¶48} *Count 34*: *Cruelty to a Companion Animal*. The State alleged that Baldwin needlessly euthanized a dog named Cheyenne on July 20, 2016. Doc. 57. At the hearing, Detective Conroy testified that he discussed Cheyenne with Dr. Gonzalez-Monska at the interview they had in May of 2018. Vol. II Tr. 24. He also stated that, on June 7, 2018, he had an interview with the foster parent to whom Baldwin had given Cheyenne on June 7, 2018. Vol. II Tr. 24. The foster parent gave a detailed statement as to what had happened in the lead up to July 20, 2016. *Id*. at 24-25. Ex. Y. This evidence is sufficient to establish that the corpus delicti

of the offense that was charged in Count 34 had been discovered more than two years before the indictment was issued.

{¶49} *Count 35*: *Cruelty to a Companion Animal*. The State alleged that, in between May 25, 2016 and July 20, 2016, Baldwin caused a dog named Cheyenne to endure unnecessary pain or allowed such pain to continue when there was a reasonable remedy that could provide relief. Doc. 57. Baldwin was the custodian of Cheyenne and placed this dog in a foster home on May 25, 2016. Doc. 57. The foster parent contacted Baldwin about several serious health issues that Cheyenne appeared to be having. Doc. 57. However, Baldwin would not return the foster parent's calls. Doc. 57.

{¶50} The foster parent then took Cheyenne to a veterinarian, who diagnosed the dog with diabetes. Doc. 57. The foster parent attempted to contact Baldwin, but he did not respond for one month. Doc. 57. Finally, the foster parent returned Cheyenne to ACT Ohio on July 19, 2016. Doc. 57. Baldwin then gave Cheyenne to a second foster parent, who realized that the dog had serious medical issues. Doc. 57. The second foster parent took Cheyenne to RAH where Baldwin refused to pay for the insulin that the dog needed and then had Cheyenne euthanized. Doc. 57.

{¶51} At the hearing, the Defense introduced a copy of Cheyenne's medical history. Vol. II Tr. 23. Ex. X. This medical report contained notes that documented several of the issues that the foster parent was having with Baldwin. Ex. X. Detective Conroy also obtained statements from Dr. Gonzalez-Monska on May 27,

2018 and from the first foster parent on June 7, 2018. Vol. II Tr. 24. Ex. J, Y. This evidence is sufficient to establish that the corpus delicti of the offense that was charged in Count 35 had been discovered more than two years before the indictment was issued.

{¶52} *Count 36*: *Cruelty to a Companion Animal.* The State alleged that Baldwin needlessly euthanized a dog named Pee Wee on June 8, 2015. Doc. 57. At the hearing, Detective Conroy testified that he had an interview with Pee Wee's owner on April 23, 2018. Vol. II Tr. 27. At this interview, Detective Conroy informed the owner that Pee Wee had been euthanized. *Id.* The owner indicated that she knew that Pee Wee "had passed away" but did not know that Baldwin had Pee Wee euthanized. *Id*. at 28. Ex. BB. This evidence is sufficient to establish that the corpus delicti of the offense that was charged in Counts 36 had been discovered more than two years before the indictment was issued.

{¶53} In conclusion, the evidence in the record confirms that the corpus delicti for each of these fourteen misdemeanor offenses was discovered at a point that was more than two years before the State issued an indictment on June 19, 2020. Doc. 1. Thus, even assuming that the statute of limitations had not begun to run before the dates mentioned in this analysis, the State's arguments that resort to R.C. 2901.13(E) do not establish that these charges were filed within the applicable statute of limitations. Since the State has not carried the burden of proving that it complied with the statute of limitations, its second assignment of error is overruled.

*Third Assignment of Error*

**{¶54}** Pursuant to R.C. 2901.13(H), the State argues that Baldwin fled the State to avoid prosecution and that this act tolled the statute of limitations.

Legal Standard

**{¶55}** R.C. 2901.13(H) states that "[t]he period of limitation shall not run during any time when the accused purposely avoids prosecution." R.C. 2901.13(H). As used in this statute,

> **The word 'prosecution' means the process of bringing those who commit crimes to justice, and in the context of the statute, that definition is not limited to the crimes of which the authorities are aware or for which the accused has been indicted.**

*State v. Bess*, 126 Ohio St.3d 350, 2010-Ohio-3292, 933 N.E.2d 1076, ¶ 24. Further, in interpreting this provision, the Supreme Court of Ohio has held that

> **the manifest purpose of R.C. 2901.13([H]) is to prevent the accused from benefiting from the statute of limitations when he or she has purposely acted to avoid being prosecuted, thereby causing the state to fail to commence a timely prosecution.**

*Id.* at ¶ 31. Thus, "it is the actions of the accused in avoiding prosecution, not the actions of the state in commencing a prosecution, that triggers the tolling of the statute of limitations." *Id.*

**{¶56}** The State bears the burden of establishing that the statute of limitations should be tolled by R.C. 2901.13(H). *Gallant*, *supra*, at ¶ 13. "Proof that the accused departed this state or concealed the accused's identity or whereabouts is prima-facie evidence of the accused's purpose to avoid prosecution." R.C.

2901.13(H). "However, this presumption is rebuttable * * * and the accused may demonstrate that he had no intention or purpose of avoiding prosecution when he left the state." *Bermudez*, *supra*, at ¶ 14.

Legal Analysis

{¶57} At the hearing on the motion to dismiss, the State argued that the statute of limitations should have been tolled pursuant to R.C. 2901.13(H). To support this argument, the State called Detective Conroy, who testified that Baldwin's text messages indicate that he became aware of the investigation into his activities in September or October of 2017. Vol. I Tr. 67. Detective Conroy then stated that Baldwin's text messages to his girlfriend indicated that "the investigation greatly upset him. He was sick, nervous, couldn't sleep, was very upset about this investigation." *Id.* at 68.

{¶58} Detective Conroy testified that Baldwin messaged Dr. Boiso in November of 2017 about relocating to California and that Baldwin moved to California on February 8, 2018. Vol. I Tr. 37. Vol. II Tr. 69, 83. Based on this information, Detective Conroy stated that he believed that Baldwin "fled Ohio to avoid this investigation." Vol. II Tr. 65. *See* Vol. I Tr. 69. With this testimony, the State presented prima facie evidence that Baldwin "departed the state * * *" during the course of an investigation into his activities. R.C. 2901.13(H).

{¶59} We turn now to examining the evidence presented by the Defense to rebut "the presumption that the statute of limitations must toll" pursuant to R.C.

-26-

2901.13(H). *State v. Parsons*, 3d Dist. Putnam No. 12-05-06, 2005-Ohio-5755, ¶ 13. The Defense elicited testimony that shed light on whether Baldwin was attempting "to abscond from justice" when he left for California. *Bess, supra*, at ¶ 26. *See also* Black's Law Dictionary (11th Ed. 2019) (defining "abscond" as "depart[ing] secretly or suddenly"). On cross-examination, Detective Conroy testified that, on January 12, 2018, Baldwin publicly announced his intention to move to California and even posted when his last appointments in Ohio and first appointments in California would occur. Vol. I Tr. 30.

{¶60} At the hearing, Eufinger testified that he, on the night that the police searched Baldwin's residence, asked the officers if Baldwin was free to leave for California. Vol. II Tr. 107. Eufinger was told that Baldwin was free to leave. *Id*. He then went to the Sheriff's office where Baldwin's seized possessions were taken and asked whether Baldwin was free to leave for California. *Id*. at 108. Again, Eufinger was told that Baldwin was free to go. *Id*. Detective Conroy confirmed that Eufinger was informed, on the night of the search, that Baldwin was not under arrest and was free to leave the state. Vol. I Tr. 71.

{¶61} The Defense also provided evidence about Baldwin's motivations for leaving Ohio. Dr. Boiso testified that Baldwin's stated reasons for relocating were family related. Vol. II Tr. 84, 96. *See* Ex. 6. On cross-examination, Detective Conroy also confirmed that Baldwin had family in California; was dating someone in California; that Baldwin's son had family in California. *Id*. at 71. Further, Dr.

Boiso testified that, when Baldwin reached out to her in November of 2017, she wanted him to move to California to participate in her animal rescue activities. *Id*. at 85, 94. She "offered to give him "$20,000 to move" to California and hired a driver to transport Baldwin's belongings. *Id*. at 85-86, 95. Dr. Boiso then secured a fifteen-month lease at a ranch for Baldwin and paid the initial rental payment for him. *Id*. at 87.

{¶62} Dr. Boiso further stated that Baldwin initially intended to move in June of 2018 and that she helped to arrange transportation for him to come to California. Vol. II Tr. 94. She testified that, as best as she could recall, the timeline for Baldwin's move shifted from June of 2018 to February of 2018 to accommodate the schedule of the person who was going to transport his belongings to California. *Id*. at 95. The lease that she signed for the ranch was prorated, so she was able to renegotiate the lease to accommodate an earlier arrival date. *Id*. at 95-96.

{¶63} The Defense next presented evidence that Baldwin did not attempt to "conceal[] * * * [his] identity or whereabouts * * *." R.C. 2901.13(H). *See Bess, supra*, at ¶ 5. Detective Conroy affirmed that Baldwin "hadn't tried to disguise himself in any way or hide[.]" Vol. I Tr. 72. Baldwin also continued to use his name publicly on Facebook, Instagram, [and] other social media profiles * * *[.]" *Id*. at 72. *State v. Taylor*, 9th Dist. Wayne No. 97CA006804, 1998 WL 332933, *5 (June 24, 1998) (noting that the accused had "made no effort to conceal his location").

**{¶64}** Further, Detective Conroy also had the address of the location where Baldwin lived in California. Vol. I Tr. 72. *See Parsons, supra*, at ¶ 14 (noting that the accused's address was on file). The address on the arrest warrant was the location where Baldwin had lived during his entire stay in California. Vol. I Tr. 72. *State v. Martin*, 8th Dist. Cuyahoga No. 100753, 2015-Ohio-761, ¶ 19 (considering the fact that "[t]he state had no difficulty locating [the accused] * * * after he was indicted").

**{¶65}** Finally, the Defense presented evidence that Baldwin's counsel was in contact with the police about the investigation. At the hearing, Cartwright testified that, before Baldwin was arrested, he

> **would periodically inquire * * * as to whether they [the police] were going forward with anything in Mahoning County. And periodically, the answer was that they were researching it, but that, likely, what would proceed would happen in Union County.**

Vol. II Tr. 103.[4] He further stated that he made it clear to the police that he was representing Baldwin and that they wanted to resolve any legal issues that might arise during the course of the investigation. *Id*. at 104. *See Gallant, supra*, at ¶ 20 (considering the fact that the accused contacted the "law director's office to find out how she could resolve the issue."). Detective Conroy further affirmed that Cartwright's partner told him that, "if you need him [Baldwin] to come back, we

---

[4] Cartwright was retained as Baldwin's attorney in February of 2019 while the police investigation was ongoing, but he was not Baldwin's attorney by the time that charges were filed. Doc. 6. Vol. I Tr. 65.

can have him come back[.]" *Id.* at Tr. 73. *See State v. Jenkins*, 5th Dist. Stark No. 2009-CA-00150, 2010-Ohio-2719, ¶ 20.

**{¶66}** In its judgment entry, the trial court found that "[t]he defendant admittedly left the state, but he did not hide his whereabouts, and the state easily arrested Defendant when indicted." Doc. 71. The trial court then determined that Baldwin's decision to leave Ohio did not implicate R.C. 2901.13(H) and did not toll the statute of limitations. Doc. 71. Having reviewed the evidence in the record, we cannot conclude that the trial court erred in reaching this determination. Thus, the State's third assignment of error is overruled.

*Conclusion*

**{¶67}** Having found no error prejudicial to the State of Ohio in the particulars assigned and argued, the judgment of the Union County Court of Common Pleas is affirmed.

***Judgment Affirmed***

**MILLER and SHAW, J.J., concur.**

**/hls**